BRITISH STEEL CORPORATION and British Steel Corporation, Inc., Plaintiffs,

v.

UNITED STATES of America, United States International Trade Commission, Defendants,

Allegheny Ludlum Steel Corporation; Armco Inc.; Carpenter Technology Corporation; Crucible Materials Group, Colt Industries, Inc.; Eastern Stainless Steel Company; Guterl Special Steel Corporation; Jessop Steel Company; Jones and Laughlin Steel Incorporated; Republic Steel Corporation; Universal-Cyclops Specialty Steel Division, Cyclops Corporation; Washington Steel Corporation; and the United Steelworkers of America, AFL/CIO–CLC, Defendants-Intervenors.

Court No. 83–7–01040.

United States Court of International Trade.

Aug. 6, 1984.

Steptoe & Johnson Chartered, Washington, D.C. (Michael Sandler and Alice L. Mattice, Washington, D.C., of counsel), for plaintiffs.

Michael H. Stein, Gen. Counsel, United States Intern. Trade Com'n, Michael P. Mabile, Asst. Gen. Counsel and Catherine R. Field, Washington, D.C., for federal defendants.

Collier, Shannon, Rill & Scott, Washington, D.C. (David A. Hartquist and Paul C. Rosenthal, Washington, D.C., of counsel) for defendants-intervenors.

*Review of International Trade Commission's Affirmative Determination of Material Injury on Agency Record Pursuant to Rule 56.1—Stainless Steel Plate from the United Kingdom*

NEWMAN, Senior Judge.

### Introduction

Plaintiffs, British Steel Corporation and British Steel Corporation, Inc. (collectively referred to as plaintiffs or British Steel), seek review upon the agency record pursuant to Rule 56.1 of the final determination by the United States International Trade Commission (Commission) that "an industry in the United States is materially injured by reason of imports of stainless steel plate from the United Kingdom (investigation No. 701–TA–196 (Final)) which have been found by the Department of Commerce to be subsidized by that Government". USITC Pub. 1391 (June 1983) at 1; 48 Fed.Reg. 27454 (June 15, 1983). Plaintiffs challenge the Commission's determination as unsupported by substantial evidence and otherwise not in accordance with law. The Commission and defendants-intervenors (domestic producers of stainless steel

plate) seek affirmance of the final injury determination.

For the reasons that follow, the Court concludes there is substantial evidence in the administrative record supporting the Commission's affirmative injury determination and such determination is in accordance with law. Therefore, the determination is affirmed.

## Background

Investigation No. 701–TA–196 (Final) was instituted by the Commission effective February 10, 1983 following a preliminary determination by the International Trade Administration of the United States Department of Commerce (Commerce) that imports of stainless steel plate from the United Kingdom were being subsidized by the government of that country. 48 Fed. Reg. 19048 (1982).[1] On May 4, 1983 the Commission held a hearing concerning its investigation of stainless steel plate from the United Kingdom and three other investigations involving stainless steel sheet and strip from the Federal Republic of Germany, France and the United Kingdom.[2] On June 9, 1983 the Commission issued its affirmative final injury determination in its investigation of stainless steel plate from the United Kingdom and transmitted its report to Commerce. *See* USITC Pub. 1391 (June 1983). In due course, plaintiffs commenced the present action on July 22, 1983.

In USITC Pub. 1391 at 3, the Commission noted that it had focused its analysis on the causal connection between the condition of the domestic industry and the subject imports "because material injury to the domestic industries is clearly present". *See also id.* at 6. As stated in the Commis-

sion's report, "all of the important economic indicators show the significantly weakened conditions of these industries [domestic producers of stainless steel sheet and strip and stainless steel plate]". *Id.* at 6. The Commission's analysis of the relevant economic indicators was based upon industry data for 1979 through the first quarter of 1983; and the Commission found that 1979 was the last year "in which the domestic industry exhibited a robust economic performance". *Id.* at 6–7.

Specifically and respecting the plate industry during the period investigated, the Commission cited the substantial declines in production, capacity utilization, shipments, employment, hours worked, wages paid to production and related workers, and financial experience as evidenced by the severe declines in net sales and operating profits resulting in the industry experiencing an operating loss in 1982. In sum, the Commission found that the domestic stainless steel plate industry was "clearly experiencing material injury". *Id.* at 8.

Focusing upon the role of the subject imports "in creating the situation faced by U.S. producers" (*Id.* at 9), the Commission found that there is a sufficient causal nexus between the imports and the difficulties experienced by the domestic industry. In reaching its conclusion regarding causation, the Commission expressly considered, among other factors: the volume of imports, underselling by imports, lost sales and price depression.

## Opinion

### I. Scope and standard of review

At the outset, it is helpful to briefly review the scope and standard of review

---

**1.** This affirmative subsidy determination by Commerce was challenged by plaintiffs in Court No. 83–7–01032 and by Allegheny Ludlum Steel Corporation in Court No. 83–7–01035, which actions are *sub judice.*

**2.** The final injury determination by the Commission contested in this action was one of four determinations in a series of antidumping and countervailing duty investigations involving stainless steel and tool steel products. Two of the investigations covered imports of stainless steel sheet and strip from the Federal Republic

of Germany and France; two investigations concerned imports of stainless steel sheet and strip and stainless steel plate from the United Kingdom. Respecting imports from the United Kingdom, the Commission made a negative determination of injury as to stainless steel sheet and strip (investigation No. 701–TA–195 (Final)), and an affirmative determination as to stainless steel plate. It is the latter affirmative determination that is contested by plaintiffs in this action.

applicable to the Commission's injury determinations.

■ Under the statute, a final affirmative injury determination by the Commission must be sustained unless it is "unsupported by substantial evidence on the record, or is otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982). *Rhone Poulenc, S.A., and Rhone Poulenc, Inc. v. United States*, 8 C.I.T. ——, 592 F.Supp. 1318 (July 19, 1984) and cases cited; *American Spring Wire Corporation v. United States*, 8 C.I.T. ——, 590 F.Supp. 1273 (July 11, 1984). *See also Armstrong Bros. Tool Co. v. United States*, 84 Cust.Ct. 16, C.D. 4838, 483 F.Supp. 312 (1980), *aff'd*, 67 CCPA 94, C.A.D. 1252, 626 F.2d 168 (1980). Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo* * * *'." *American Spring Wire Corporation*, *supra*, quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). This teaching of the Supreme Court is applicable to a review of the Commission's injury determination. *See American Spring Wire Corporation*, *supra*; *Sprague Electric Co. v. United States*, 2 Ct. Int'l Trade 302, 310–11, 529 F.Supp. 676, 682–83 (1981). *Accord, Pasco Terminals, Inc. v. United States*, 68 CCPA 8, C.A.D. 1256, 634 F.2d 610 (1980).

## II. *Material injury*

The following observations in *American Spring Wire Corporation*, 8 C.I.T. at ——, 590 F.Supp. 1273, concerning "material injury" are also pertinent to the present review:

In its final antidumping and countervailing duty investigations, the ITC is required to determine whether:

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded, by reason of imports of the merchandise with respect to which the administering authority [ITA] has made an affirmative determination....

19 U.S.C. §§ 1671d(b)(1) and 1673d(b)(1) (1982). [Footnote omitted] The Commission must make an affirmative finding only when it finds *both* (1) present material injury (or threat to or retardation of the establishment of an industry) *and* (2) that the material injury is "by reason of" the subject imports. Relief may not be granted when the domestic industry is suffering material injury but not by reason of unfairly traded imports. Nor may relief be granted when there is no material injury, regardless of the presence of dumped or subsidized imports of the product under investigation. In the latter circumstance, the presence of dumped or subsidized imports is irrelevant, because only one of the two necessary criteria has been met, and any analysis of causation of injury would thus be superfluous.

"Material injury" has been defined by Congress as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1982). Congress has directed the ITC to consider "all relevant economic factors which have a bearing on the state of the industry," *id.* § 1677(7)(C)(iii) * * *. [Emphasis in original.]

And as recently observed in *Rhone Puolenc*, 8 C.I.T. at ——, 592 F.Supp. 1318:

In contrast to the dearth of guidelines for the determination of threat of injury, the statute contains detailed specifications for the determination of material injury. In general, " 'material injury' means harm which is non-inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1982); 19 C.F.R. § 207.27 (1983). In making an injury determination, the Commission is re-

quired to consider, among other factors, the following:

(i) the volume of imports of the merchandise which is the subject of the investigation;

(ii) the effect of imports of that merchandise on prices in the United States for like products, and

(iii) the impact of imports of such merchandise on domestic producers of like products.

19 U.S.C. § 1677(7)(B)(i)–(iii) (1982); *see* 19 C.F.R. § 207.26(a)(1)–(3) (1983).

## III.  *Issues presented*

Plaintiffs maintain that the Commission's determination in this case is unsupported by substantial evidence and otherwise is not in accordance with law in that:

(1) the Commission erred by finding that the import volumes of stainless steel plate from the United Kingdom had increased during the period investigated and in disregarding plaintiffs' data showing that the subject imports were declining during the most recent twelve month period covered by the investigation;

(2) the Commission erred by finding that the subject imports were underselling stainless steel plate produced in the United States and in disregarding the presence of special costs of purchasing British Steel's plate which offset any margins of underselling found in connection with the plate imports;

(3) the Commission erred in finding that the subject imports were causing price depression in the United States market and in disregarding plaintiffs' demonstration of a total absence of correlation between the volume of imports from the United Kingdom and United States prices.

In support of the affirmative injury determination, the Commission and intervenors urge:

(1) the volume of subsidized British imports of stainless steel plate was significant both in absolute terms and as a proportion of United States consumption (level of market penetration) and such volume

was increasing during the period investigated;

(2) the subject imports substantially undersold the domestic product as evidenced by selling prices and lost sales.  Plaintiffs' cost analysis is irrelevant under the statute which focuses on prices;

(3) the subsidized imports contributed to price depression experienced by the domestic industry, and the absence of a direct correlation between the volume of stainless steel plate imports from the United Kingdom and prices for the domestic product is irrelevant.

## IV.  *Volume of imports*

We first consider plaintiffs' challenge to the Commission's findings relative to import volume.

Respecting the volume criterion of the statute as an indicium of injury, the Commission is directed to "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to the production or consumption in the United States, is significant".  19 U.S.C. § 1677(7)(C)(i) (1982).

The Commission collected and evaluated data on the absolute volume of imports of stainless steel plate from the United Kingdom and the proportion of the United States market captured by these imports (*viz.*, market penetration).  Upon the basis of such data, the Commission found that the absolute volume of imports of British stainless steel plate, on an annual basis, increased substantially in the last two full years covered by the investigation.  Indeed, 1982 imports of British plate rose to the highest point since 1970.  USITC Pub. 1391, at A–57.  The Commission further found that the absolute volume of imports and levels of market penetration by the imports are significant in terms of section 1677(7)(C)(i).  There can be no doubt that the Commission complied with the volume criterion in section 1677(7)(C)(i) (1982).

Plaintiffs advance the position that the Commission erred as a matter of commer-

cial reality in making its analysis of import volumes on a calendar year basis and by not considering the most recent quarterly data on import volumes.

The "commercial reality" allegedly not considered by the Commission was that in 1980 Great Britain was affected by a nationwide steel strike, the effects of which lasted throughout 1980 and into the first quarter of 1981. According to plaintiffs, during the strike British exports to the United States "were virtually nonexistent", and in the first quarter of 1981, imports of British steel began returning to "normal levels". Further, plaintiffs emphasize that prior to 1980, import volumes were suppressed by import quotas and a severe exchange rate imbalance in 1979.

Predicated upon the foregoing "dislocations," plaintiffs contended before the Commission and now urge before the Court that "import volumes should be measured against a *benchmark* that was unaffected by either the 1980 strike or the pre-1980 dislocations" (emphasis by plaintiffs). Specifically, plaintiffs insist that had the Commission measured import volumes beginning with the second quarter of 1981, the Commission would have had a basis for finding that import volumes were not increasing within the meaning of 19 U.S.C. § 1677(7)(C)(i), but in fact had decreased over the last four quarters (second quarter of 1982 to the first quarter of 1983).

Assessing the significance of the volume of imports of stainless steel plate from the United Kingdom, the Commission observed (USITC Pub. 1391, at 15):

Unlike sheet and strip, subsidized imports of plate from the United Kingdom play a significant role in the U.S. market and have caused material injury to the U.S. industry. Imports of plate decreased from 610 tons in 1979 to 273 tons in 1980 and then increased to 2,985 tons in 1981 and 3,607 tons in 1982. [Footnote omitted] Market penetration decreased from 0.4 percent in 1979 to 0.2 percent in 1980 and then increased to 2.5 percent in 1981 and 3.4 percent in 1982.

In 1982, the level of plate imports was the highest since 1970.

The Court cannot agree with plaintiffs' argument that the Commission erred regarding its findings of import volume.

First, plaintiffs' contention that the Commission overlooked its analysis of import volume is mistaken. Thus, USITC Pub. 1391 states (at A–62, 63):

From June 1976 to February 1980, imports of stainless steel sheet, strip, and plate, as well as other stainless steel products, were subject to quantitative restrictions. These restrictions, as well as the 3-month strike against British Steel Corp. in early 1980, may have suppressed the level of stainless steel imports from the United Kingdom during this period. However, imports of both stainless sheet and strip and of stainless plate increased from 1981 to 1982, by 9 and 21 percent, respectively. Imports of sheet and strip continued their increase in January-March 1983, when they surpassed 50 percent of the entire previous year's imports (table 25).

\* \* \* \* \* \*

Counsel for BSC [British Steel] suggested that the Commission evaluate trends in quantities of stainless steel sheet, strip, and plate imports from the United Kingdom not on a calendar-year basis, but from April to March because of lingering effects of the 1980 strike in January-March 1981 (transcript of hearing, p. 162). Such data may be examined in tables 31 and 33.

From the foregoing, it is obvious that the Commission understood the import volume methodology advocated by British Steel.

Second, plaintiffs' challenge to the Commission's findings relative to import volume on the basis of the time frame of its analysis and the Commission's reliance upon annual data is without merit. As mentioned, *supra,* plaintiffs insist that the Commission's findings regarding import volume should have been guided not by the *calendar-year* data utilized by the Commission, but rather by a *quarterly* analysis of

the most recent data available covering the second quarter of 1982 to the first quarter of 1983.

A similar objection to the Commission's approach was recently rejected in *American Spring Wire Corporation*, wherein the Court commented (8 C.I.T. at ——, 590 F.Supp. 1273):

> In addition to criticizing the weight given by the ITC to various economic factors, plaintiffs challenge the time frame used in the agency's analysis of the industry. They allege that the ITC "should have conducted its review on a quarterly basis, rather than a calendar year basis, in its material injury investigation," and that it should have concentrated on the most recent quarters, *i.e.*, the first three quarters of 1982.
>
> *But the ITC is not required by statute to use any particular time frame for its analysis, although it generally focuses on annual time periods.* At best, plaintiffs can point to excerpts from the legislative history indicating that data *may* be considered on a quarterly basis. *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 47–48 (1979) (quarterly analysis of increases in market penetration is appropriate in some investigations of *threat* of material injury). *This is hardly a mandate for quarterly analysis on demand of petitioners.* [Emphasis added.]

Continuing, the Court stated:

> Plaintiffs have failed to demonstrate that the ITC's use of its standard annual analysis constituted error. Plaintiffs' preference for quarterly analysis (with the accent on more recent quarters) is based, apparently, on a decline in certain trends toward the close of the time period analyzed by the ITC. However, it was reasonable for the ITC to rely on its customary annual analysis since the investigations showed considerable fluctuation in quarter-by-quarter data, analysis of which would distort significant longer term trends.

■ Hence, notwithstanding plaintiffs' analysis of the effect of the import quotas and 1980 strike, the Court cannot conclude, in light of the long term trend, that the Commission's methodology respecting import volume was incorrect. It is true the Commission had data which showed that import volumes of stainless steel plate from the United Kingdom decreased substantially in the most recent twelve month period encompassed by the investigation (April 1982 to March 1983) as compared with the previous twelve month period (April 1981 to March 1982). But, such recent short term downtrend from a high level of imports does not, as a matter of law, negate the significance of the increasing absolute volume of imports on a long term basis. This is particularly the case here where the record shows that consumption declined substantially between 1978 and 1982, and import penetration levels (ratios of imports to total United States consumption) increased sharply in 1981 and 1982. *See* USITC Pub. 1391 at 15. The administrative record also shows that total stainless steel plate imports from the United Kingdom, which declined in 1979 and 1980, began to increase in 1981 and reached a five year high in 1982. In point of fact, the volume of stainless steel plate imports from the United Kingdom rose by thirty-five percent between 1978 and 1982. Indeed, British Steel accounts for approximately ninety-nine percent of the imports from the United Kingdom covered by the Commission's investigation. A.R. (Pub.) 55 at 16 n. 60.

Further, intervenors point out that: (1) the decline in plate imports that plaintiffs attribute to the 1980 strike, in fact, began in 1979, one year prior to the strike; and (2) the quarterly levels of imports after the strike (*viz.*, in 1981 and 1982) were generally significantly higher than pre-strike quarterly levels. Consequently, as stressed by intervenors, it appears that the strike fails to fully explain the sharp 1982 increase in volume of imports. The Court also agrees with intervenors that whatever the reason for the increase in imports, the record shows that annual imports of British plate in 1981 and 1982 reflected substantial in-

creases over all the preceding years as far back as 1970.

## V.  *Price undercutting*

Turning to the price criterion for determining material injury that is in dispute, the statute directs the Commission, in evaluating the effect of imports on prices, to consider whether "there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States".  19 U.S.C. § 1677(7)(C)(ii) (1982).

In its decision (USITC Pub. 1391 at 15) the Commission found:

> Imports of plate from the United Kingdom undersold the domestic products in all four specifications for which BSC [British Steel] provided data. [Footnote omitted.]  Underselling occurred throughout 1980–1982 with the exception of one quarter in one specification. [Footnote omitted.]

> The Commission contacted eight firms which had purchased British plate and one firm which stated that it had used a price quote from BSC to negotiate a more favorable price from a U.S. producer.  [Footnote omitted.]  Four firms gave price as the primary reason for purchasing British plate.  Two other firms stated that favorable credit terms or the availability of a refund of duties on its own exports were the reason for its purchase.  One firm stated that the primary reason that it purchased British plate was the availability of smaller tonnage orders without paying a premium. [Footnote omitted.]

Pub. 1391, at A–63, also notes:

> Counsel for BSC introduced the concept of cost of purchase vs. purchase price in connection with the leadtime for BSC's sales, maintaining that other costs associated with its long leadtimes offset the lower price of the BSC steel. [Footnote omitted.]  Petitioners counter by questioning why any firm would pay more to receive delivery later.  [Footnote omitted.]

As urged before the Commission, plaintiffs argue here that special costs incurred by customers due to the long lead time in placing orders offset the effect of the admittedly lower prices at which the British stainless steel plate was sold in the United States, and hence the imports did not "undercut" the domestic product within the meaning of the statute.

The Court cannot agree with plaintiffs' cost methodology.

First, 19 U.S.C. § 1677(7)(C)(ii)(I), which requires the Commission to consider whether "there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States" focuses solely on *prices* and does not mandate any *cost* analysis or adjustment of prices for cost factors respecting the purchase of the imported product.  Ignoring the plain language of the statute, which as mentioned above focuses solely on actual prices, plaintiffs' attempt to extrapolate fictitious "prices" by utilizing a cost adjustment factor.  The short answer is that the statute does not authorize such adjustment of prices.

Second, the so-called "costs" associated with the long lead time (roughly four months) for deliveries from British Steel would, of necessity, vary from customer to customer and from time to time depending upon a multitude of varying subjective intangibles such as the desirability of quick delivery on short notice, the efficiency of the customer's warehousing and inventory control, the ability of a customer to anticipate its future needs, the probability of changes in need for stainless steel plate during the lag period, and possible carrying charges.  Plainly, the statute does not contemplate an adjustment to actual selling prices for the cost factors cited by plaintiffs, which at best would be subject to rough estimates or outright speculation. Even on the basis of an estimate, however, the record indicates that British Steel's prices were below that level allegedly required to meet competition.  Thus, as noted in defendants' memorandum, at 14–15, the one purchaser who estimated the necessary

discount to compensate for additional lead time bought British plate well below even that price. A.R. (Conf.) 11 at A–129.

## VI. *The alleged absence of correlation between increasing volume of imports and price depression.*

To support its contention that the subject imports were not the cause of price depression experienced by the domestic industry, plaintiffs rely on a correlation analysis submitted to the Commission. Tr., May 4, 1983, at 163–65 (A.R. List No. 1, Document Nos. 40 and 41). According to plaintiffs, the correlation analysis shows that at times when United States prices were declining, British imports were also declining; conversely, when United States prices were increasing, it was in those periods that British imports were increasing. Essentially, plaintiffs insist that the absence of correlation between declining United States prices (price depression) and the volume of British imports establishes conclusively that the imports were not the cause of the price depression.

Counsel for the Commission, however, points up that plaintiffs' analysis incorrectly assumes that the British imports were the sole factor relevant to the price depression experienced by the United States industry, when in fact the British imports were only one of many factors affecting the price decline, such as the decline in consumption and the effect of other imports.

█ The Court agrees with the contention of the Commission that an absence of a direct correlation between price depression and the volume of imports does not necessarily exonerate the imports as a causal factor of the price depression. The statute's causation prerequisite to an affirmative injury determination is satisfied if the subsidized imports contribute, even minimally, to the conditions of the domestic industry, and the Commission is precluded from weighing the causes of injury. Thus, S.Rep. No. 249, 96th Cong., 1st Sess. 57 (1979), U.S.Code Cong. & Admin.News 1979, p. 443 states:

Current law does not, nor will section 705, contemplate that the effects from the subsidized imports be weighed against the effects associated with other factors (*e.g.*, the volume of prices of non-subsidized imports, contraction in demand or changes in patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology, and the export performance and development and productivity of the domestic industry) which may be *contributing* to overall injury to an industry. *Nor is the issue whether subsidized imports are the principal, a substantial, or a significant cause of material injury.* Any such requirement has the undesirable result of making relief more difficult to obtain for industries facing difficulties from a variety of sources; such industries are often the most vulnerable to subsidized imports. [Emphasis added.]

See also H.R.Rep. No. 96–317, 96th Cong., 1st Sess. 47 (1979). As the legislative history makes clear, imports from a particular country need not be the sole or even principal cause of material injury, but need only be a contributing cause. Since the test of causation is whether the imports from a particular country are *contributing* to the injury being suffered by the domestic industry, plaintiffs' correlation analysis is flawed due to the fact that a significant volume of imports can contribute to price depression, whether that volume happens to be increasing or decreasing during a particular period of time.

█ The Court finds there is substantial evidence that the significant volume of imports of stainless steel plate from the United Kingdom was a *contributing factor* to the price depression experienced by the domestic industry.

While the alleged absence of correlation between increased volume of imports and declining prices does not alone negate that material injury to the industry in the United States is not causally related to the imports, the Court notes that the domestic

industry provided the Commission with an analysis of import volumes, lagged for one quarter,[3] compared to domestic prices. This analysis indicates a positive relationship between increases in imports and domestic price declines, particularly in late 1981 and early 1982. Again, as noted by intervenors, "during the year 1982—when imports were at their highest level ever— domestic stainless steel plate prices dropped in certain quarters to levels below any quarter in 1980 or 1981." Petitioners' Final Posthearing Brief, A.R. (Pub.) 45 at 3–4.

### VII. Commission's failure to address plaintiffs' arguments in its decision.

■ Plaintiffs contend that the Commission's determination cannot be supported by substantial evidence because the Commission failed to address plaintiffs' defenses, main contentions and evidence.

Respecting the Commission's consideration of plaintiffs' evidence, "[a]bsent some showing to the contrary, the Commission is presumed to have considered all evidence in the record". Rhone Poulenc, supra. There has been no showing that plaintiffs' evidence was not considered by the Commission. Plaintiffs, however, are accurate in stating that their main contentions were not disposed of by the Commission. The issue raised by plaintiffs is whether the Commission's determination is unsupported by substantial evidence or contrary to law for that reason. The Court concludes that plaintiffs' argument is without merit.

■ While there can be little doubt that it would be helpful to the parties and to the Court if the Commission were to specifically address the main contentions of the parties, it cannot be said that the law imposes

such a requirement on the Commission. Congress has spoken on the matter of the content of the Commission's notice of determination in its injury investigation. Under 19 U.S.C. § 1671d(d), the Commission in making its final determination is required to disclose only the facts and conclusions of law upon which the determination is based. The statute imposes no requirement on the Commission that it respond to the arguments presented by the parties appearing before it. In the present case, the Court finds that the Commission, notwithstanding that it did not specifically dispose of plaintiffs' arguments, made an adequate statement of reasons in its report that discussed the facts upon which the determination was predicated and that addressed the statutory criteria of injury relied upon. In short, the basis for the Commission's affirmative determination, factually and legally, is clear. The controlling statute does not require more.

In Pasco Terminals, Inc. v. United States, 83 Cust.Ct. 65, 85–86, D.C. 4823, 477 F.Supp. 201, 218–19, aff'd 68 CCPA 8, C.A.D. 1256, 634 F.2d 610 (1980), the plaintiff urged a position similar to that taken here by British Steel, and the Court rejected the argument on the ground that the then applicable statute (19 U.S.C. § 160(a)) contained no requirement that the Commission respond to the parties' contentions in its statement of reasons. As in Pasco, the pertinent statute here (19 U.S.C. § 1671d(d)) contains no requirement that the Commission must rule on the arguments presented by the parties appearing before it.

To the extent that the precedents cited by plaintiffs in their reply brief at 3 and at oral argument (on July 25, 1984) held that a particular agency was required to respond to the parties' contentions,[4] such cases are

---

**3.** According to intervenors (brief at 8), the time lag was used to approximate the four-month delivery lead time cited by British Steel, because the price effect on imports in the domestic market occurs at the time an order is placed, rather than at the date of delivery.

**4.** See Argo-Collier Truck Lines Corp. v. United States, 611 F.2d 149, 152 (6th Cir.1979); Pitre

Bros. Transfer, Inc. v. United States, 580 F.2d 140, 143 (5th Cir.1978); Humboldt Express, Inc. v. Interstate Commerce Commission, 567 F.2d 1134, 1137 (D.C.Cir.1977); and Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission, 547 F.2d 633, 646 (D.C.Cir.1976).

inapposite here where a statute specifically governs the content of the Commission's notice of determination, and where the Commission's notice of its findings of fact and conclusions of law are in compliance with the statute. Moreover, while plaintiffs' specific contentions concerning the issues of import volume, price undercutting and price depression were not expressly addressed by the Commission, its findings and conclusions are clear on those aspects of its investigation.

*SCM Corp. v. United States,* 84 Cust. Ct. 227, C.R.D. 80–2, 487 F.Supp. 96 (1980), relied upon by plaintiffs, is plainly distinguishable. In *SCM,* the Commission failed to provide reasons for its principal conclusions and the action was remanded for further explanation. That situation is not presented here where the Commission meticulously explained the basis for its determination.

## VIII. *Conclusion*

■ In its investigation respecting imports of stainless steel plate from the United Kingdom, the Commission found that the domestic producers were clearly experiencing material injury. Nonetheless, in accordance with the statute, the Commission was required to determine whether such injury was "by reason of" the subsidized imports in question. In this connection, the Commission properly recognized that there were many causes of injury to the domestic industry other than the subsidized British imports, but that it was precluded from weighing causes of injury. The Court finds that the Commission properly applied the relevant statutory criteria in its determination, and that the administrative record contains substantial evidence showing the subsidized imports were a contributing cause to the condition of the domestic industry. The Court concludes, therefore, that the statutory requirement of a causal link between the subsidized imports and the material injury experienced by the domestic industry has been satisfied.

For the foregoing reasons, the Commission's determination that imports of stain-

less steel plate from the United Kingdom have caused material injury to an industry in the United States is affirmed. Accordingly, this action is dismissed.