KEYES FIBRE COMPANY and Packaging Corporation of America, Plaintiffs,

v.

UNITED STATES of America, Defendant,

and

Fripp Fibre Forms Inc., Intervenor–Defendant.

Court No. 85–08–01100.

United States Court of International Trade.

March 16, 1988.

**584**

Patton, Boggs & Blow (Frank R. Samolis, Jennifer A. Hillman and Daniel E. Waltz), Washington, D.C., for plaintiffs.

Office of General Counsel, U.S. International Trade Com'n (Lyn M. Schlitt, James A. Toupin, Charles H. Nalls, and George W. Thompson), Washington, D.C., for defendant.

Busby, Rehm and Leonard, P.C. (Bruce Aitken and Edward R. Easton), Washington, D.C., for intervenor-defendant.

## OPINION & ORDER

AQUILINO, Judge:

In this action, plaintiffs Keyes Fibre Company ("Keyes") and Packaging Corporation of America ("PCA") seek review of a final determination of the International Trade Commission in *Molded Pulp Egg Filler Flats from Canada,* 50 Fed.Reg. 30,247 (July 24, 1985), that, despite the presence of material injury to the domestic molded-pulp egg-filler-flat industry, the necessary causal link of that injury to less-than-fair-value Canadian imports does not exist.

### Background

Following a preliminary determination by the International Trade Administration, U.S. Department of Commerce that egg-filler-flats from Canada "are being, or are likely to be, sold in the United States at less than fair value"[1], the ITC instituted a final antidumping investigation which led to the above-cited determination contested herein by the plaintiff U.S. producers of like merchandise. The results of that investigation, as well as the determination and the views of the Commission thereon, are contained in USITC Pub. 1724, Record Document ("R.Doc.") 88. On its part, Commerce had reached a final determination that

> egg filler flats from Canada are being sold in the United States at less than fair value, pursuant to ... 19 U.S.C. 1673(a).... One exporter ... is excluded from this determination because we found *de minimis* margins on the sales at less than fair value.

We have found that the foreign market value of egg filler flats exceeded the United States price on 88 percent of the

---

1. *Egg Filler Flats From Canada: Preliminary Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 2,320 (Jan. 16, 1985).

sales compared. These margins ranged from 0 percent to 44.16 percent. The overall weighted-average margin on all sales compared is 14.93 percent.[2]

The product in question consists of "disposable trays of molded pulp specially configured to hold and protect eggs during storage and transit from egg producers to distributors and bulk consumers." Pub. 1724 at A–2. The ITC investigation found that the 5 × 6 variety (flats made to seat and separate 30 chicken eggs, 5 rows of 6 eggs each) accounted for more than 95 percent of U.S. consumption and constituted the bulk of both U.S. and Canadian producers' shipments. Id. at A–2 to A–3. The channels of distribution of those shipments are described as follows in the report of the investigation:

Most egg filler flats sold in the United States by U.S. and Canadian producers are sold to packaging distributors and, more recently, to egg-producers' cooperatives, which in turn sell to end users, i.e., egg producers and packers. Cooperatives, supplied by Fripp Fibre only, are similar to distributors in that they place orders, advertise, and invoice buyers, and they may sell flats to non-members as well as members. They are dissimilar to distributors in that they are organized by and for the mutual benefit of egg producers/packers, i.e., their membership; the membership is subject to dues (generally assessed on the basis of the number of eggs produced); they offer less service, e.g., they do not sell less than truck-load quantities nor deliver within a day's notice; they offer a relatively limited line of packaging materials; and they do not employ the larger amounts of labor and capital, such as sales personnel and warehousing facilities, that distributors' greater service and full-line operation require. U.S. producers have not sold flats directly to cooperatives, primarily to avoid the risk of antagonizing and losing the business of distributors which have traditionally supplied cooperatives' members. U.S.-produced flats purchased by cooperatives or by cooperatives' members are purchased from distributors. Some egg filler flats are sold to egg producers and packers directly, although not where they have usually been supplied by a distributor. Id. at A–4 to A–5 (footnote omitted).

In other words, a U.S. distributor is a traditional "middleman", purchasing filler-flats directly from a producer and then reselling them to end-users. The price that the producer charges the distributor is extrapolated from a predetermined end-user price, less a discount. See id. at A–5. The amount of the discount is based on the number of services provided by the distributor. In turn, the distributor usually charges a price below the producer's list end-user price.

In comparison, a cooperative serves as a conduit for the placement of orders. Upon receipt of such an order, a producer will ship the filler-flats directly to the end-user. The producer invoices the cooperative at a set price, reflecting the entire cost of the producer-to-end-user transaction. The cooperative then bills the end-user an amount which includes a premium or service charge.

Transportation costs are an important element of the price of both the domestic and imported product. Domestic producers bill a set amount for freight to the distributors and absorb any additional such expense. In contrast, Fripp pays initially all transportation costs for shipping cooperative orders to end-users. In turn, those charges are covered by Fripp's pre-set price.

As indicated at the beginning, the Commission determined that "the domestic molded pulp egg filler flat industry is experiencing material injury"[3], but nevertheless "concluded that there is no causal connection between any material injury to the industry and the LTFV imports from Cana-

---

**2.** *Egg Filler Flats From Canada: Final Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 24,009 (June 7, 1985). The weighted-average margin applies to Fripp Fibre Forms,

which has intervened in this case as a party defendant.

**3.** Pub. 1724 at 7 (footnotes omitted).

da"[4] based on the following rationale:

LTFV imports from Canada have increased since 1982, as has the Canadian share of U.S. consumption. U.S. end users have generally had to pay less for Canadian egg filler flats than U.S.-produced flats. These facts alone might indicate that imports are causing the material injury suffered by the domestic industry. However, the different ways in which the LTFV imports and the domestic product are distributed indicate that imports are not causing that material injury. Pub. 1724 at 8 (footnotes omitted).

\* \* \* \* \* \*

Egg filler flats go through two levels of sale in each distribution channel; the distributor-cooperative level and the end user level. No significant under-selling by the Canadian producer has occurred at the distributor-cooperative level. Indeed, imports have frequently been priced higher than domestic flats. At the end user level, sales of Canadian flats by cooperatives have occurred at net prices significantly below sales of domestic flats by distributors. The data show that cooperatives, which in many instances paid higher prices for imported flats than distributors paid for domestic flats, have been able to charge end users a lower price than distributors. Such pricing policies are consistent with cooperatives' objective to provide their members with flats at low prices. Thus, the lower end user prices are caused by the characteristics of a cooperative versus a distributor, not by the LTFV imports. The only lost sales documented in the record were at the end user level, and therefore, not caused by the LTFV imports. *Id.* at 9–10 (footnotes omitted).

The plaintiffs dispute this analysis, articulating their position as follows:

... Plaintiffs' primary contention, and indeed the basis for this action, is that the ITC fundamentally erred in the manner in which it compared "delivered" prices reported by Plaintiffs at the dis-tributor/cooperative level of trade with "delivered" prices reported by the Canadian exporter, Fripp. . . .

... Plaintiffs acknowledge that the Commission has discretion to choose the methodology and level of trade at which to make its comparisons [but] submit that, when any such analysis is made, it must be based on comparable prices. If comparable prices are not used by the Commission, the objective of the antidumping law—an efficient and fair comparison of prices—is not achieved. Contrary to that principle, the Commission's Final Determination is based in large part on a comparison of Canadian prices for deliveries to *end users* with domestic prices for deliveries to *distributors.* Thus, it is this factual error rather than the underlying methodology which forms the basis of Plaintiff's appeal. That error, in turn, so tainted all of the Commission's conclusions regarding underselling and causality that a remand is compelled.[5]

The plaintiffs have interposed a motion pursuant to CIT Rule 56.1 for judgment on the agency record on the ground that the Commission's final determination is unsupported by substantial evidence and otherwise not in accordance with law within the meaning of 19 U.S.C. § 1516a(b)(1)(B). Jurisdiction of the court is based on 28 U.S.C. § 1581(c).

### Discussion

The ITC's task in accordance with 19 U.S.C. § 1673d(b)(1) has been to ascertain whether the U.S. industry is materially injured by reason of the foreign filler-flats brought into the country on order of farmers' cooperatives where Commerce has found those sales at less than fair value. The governing statute, 19 U.S.C. § 1677(7), provides in subparagraph (B) *et seq.* that the

Commission shall consider, among other factors—

---

**4.** *Id.* at 7–8.

**5.** Plaintiffs' Reply Brief, pp. 1–2 (footnotes omitted, emphasis in original).

(i) the volume of imports of the merchandise which is the subject of the investigation,

(ii) the effect of imports of that merchandise on prices in the United States for like products, and

(iii) the impact of imports of such merchandise on domestic producers of like products.

(C) Evaluation of volume and of price effects.—For purposes of subparagraph (B)—

(i) Volume.—In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

(ii) Price.—In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

(iii) Impact on affected industry.—In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices, and

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

Preliminarily, in the exercise of its discretion in administering this law [6], the ITC found a reasonable indication that the U.S. industry was being materially injured by the imports in question. *See Egg Filler Flats From Canada,* 49 Fed.Reg. 37,857 (Sept. 26, 1984). This decision was based "primarily upon ... findings that the domestic industry is unprofitable, that imports from Canada are increasing, and that some imports have undersold domestically-produced egg filler flats". R.Doc. 34 at 3. The focus was on delivered, end-user prices, and it uncovered consistent underselling of Keyes and PCA products by the imports. *See id.* at A–19. *See also id.* at 9. Thereafter, the ITC staff also sought to compare weighted-average f.o.b. prices for domestic and Canadian producers in the Prehearing Report. *See* Confidential Document ("ConfDoc") 9 at A–29 to A–34.

In the end, the Commission did not opt to render its final determination on a comparison of either end-user or f.o.b. prices. Plaintiffs' counsel now claim that it was error not to have done so. More precisely, their position is presented as an "auxiliary argument" that the

> ITC could make more accurate price comparisons at the f.o.b. or end-user level ... [b]ecause both end-user and f.o.b. prices are already on the record, and reflect a fair comparison between domestic prices and Canadian prices....[7]

The short answer to this is that the ITC's declination of either approach on final analysis did not violate 19 U.S.C. § 1516a(b)(1)(B). While plaintiffs' papers reveal some evidence on the record tending to favor their alternative position, it does not rise to a level entitling them to relief thereon.

 The judicial starting point in an action such as this is that a "reviewing court must accord substantial weight to an agency's interpretation of a statute it administers". *American Lamb Company v. United States,* 785 F.2d 994, 1001 (Fed.Cir. 1986), citing *Zenith Radio Corporation v.*

---

6. *Compare* 19 C.F.R. § 207.26 *with id.,* § 207.27.

7. Plaintiffs' Reply Brief, p. 10.

*United States*, 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445–46, 57 L.Ed.2d 337 (1978), and *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). In other words, "Congress intended application of a narrow judicial review standard". *American Lamb Company v. United States*, 785 F.2d at 1004. In apparent recognition of this standard, the plaintiffs do not argue in their main point, as quoted above, page 586, that the Commission does not have broad discretion, but rather that its final determination is based on an erroneous comparison of Canadian prices to end-users with U.S. prices to distributors or of "apples and oranges"[8]. This point is well-taken.

The record clearly shows that the ITC chose to analyze the question of causation at the distributor/cooperative level, or at the point of first sale of the filler-flats. Despite finding "[t]wo distinct channels of distribution, each with two levels of sale"[9] and that "[e]gg filler flats go through two levels of sale in each distribution channel; the distributor-cooperative level and the end user level"[10], the Commission's final analysis rests on price at the first level for the domestic product vis-à-vis price at the second level for the imports. However, that second level necessarily entails additional cost for freight. Indeed, the ITC staff determined that "costs of transporting egg filler flats from the producers to the end user are *significant* and *vary substantially* according to the destination." ConfDoc 16 at A–35 (emphasis added). This is especially true for the intervenor-defendant, located as it is in Saskatchewan[11], and the existing negative differential would be greater but for a truck backhaul freight pattern. *See id.* at A–43.

The Commission's determination hangs on the fact that farmers' cooperatives and independent distributors are not identical in nature, to wit, "the lower end user prices are caused by the characteristics of a cooperative versus a distributor, not by the LTFV imports." Pub. 1724 at 10. As quoted above, page 3, distributors were found to offer a wider range of services, tending to make their role in the domestic channel of commerce more costly.

Notwithstanding those differences, freight is one element that is a constant in both channels of distribution. Yet, the ITC compared prices encompassing differing amounts therefor. In other words, the price to the importing cooperatives reflected freight from Fripp all the way to the farmers, whereas the freight for shipments through the distributors[12] went no further than their doorsteps. The subsequent steps to end-users are often substantial given the number of distributors within but three vast geographic regions of the continental United States, namely, Midwest, South and West.

The plaintiffs claim to "merely seek correction of the erroneous price comparisons underlying the Commission's flawed analysis." Plaintiffs' Reply Brief, p. 3. The antidumping law " 'expressly requires a fair comparison' ". *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 69, 592 F.Supp. 1318, 1337 (1984), quoting *Smith–Corona Group v. United States*, 713 F.2d 1568, 1578 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). *See also American Lamb Company v. United States*, 785 F.2d at 1004 (the court's review is to "ascertain whether there was a rational basis in fact for the determination"), quoting from S.Rep. No. 249, 96th Cong., 1st Sess. 252 (1979), U.S.Code Cong. & Admin.News 1979 381, 638.

In another case involving freight charges for competing Canadian and domestic

---

**8.** *Id.* at 5; transcript of oral argument ("Tr.") at 13.

**9.** Pub. 1724 at 8.

**10.** *Id.* at 9.

**11.** *See* ConfDoc 16 at A–42 to A–43. *See also* Tr. at 41 (comparison of Fripp sales "very highly influenced by the transportation charges").

In the United States, Keyes produces filler flats at Hammond, Indiana and Sacramento, California; PCA also has facilities in Indiana and California, as well as at Macon, Georgia.

**12.** The court notes in passing that the ITC investigation found some direct factory shipments of the domestic filler-flats but not of any consequence to the issue at bar.

goods, *Maine Potato Council v. United States,* 9 CIT 293, 301, 613 F.Supp. 1237, 1245 (1985), the court stated that, "[w]hen comparing the price of United States goods with the price of imports, the Commission must compare prices at the level of actual competition in the United States market." The court cited the decision in *British Steel Corporation v. United States,* 8 CIT 86, 95, 593 F.Supp. 405, 412 (1984), on which the defendant and the intervenor-defendant now rely and wherein foreign producers challenged an affirmative ITC determination of material injury by reason of their exports of stainless steel plate. The plaintiffs argued that "special costs incurred by customers due to the long lead time in placing orders offset the effect of the admittedly lower prices" of the imports. *Id.* The court rejected "plaintiffs' attempt to extrapolate fictitious 'prices' by utilizing a cost adjustment factor." *Id.* The court indicated that that factor—time—depended

> upon a multitude of varying *subjective intangibles* such as the desirability of quick delivery on short notice, the efficiency of the customer's warehousing and inventory control, the ability of a customer to anticipate its future needs, the probability of changes in need for stainless steel plate during the lag period, and possible carrying charges. Plainly, the statute does not contemplate an adjustment to actual selling prices for the cost factors cited by plaintiffs, which at best would be subject to *rough estimates* or *outright speculation.* Even on the basis of an estimate, however, the record indicates that British Steel's prices were below that level allegedly required to meet competition. Thus, ... the one purchaser who estimated the necessary discount to compensate for additional lead-time bought British plate well below even that price. 8 CIT at 96, 593 F.Supp. at 412–13 (emphasis added).

Clearly, such a multitude of varying subjective intangibles is not at issue here. Whereas the time factor in *British Steel* required "rough estimates" and "outright speculation", the freight factor for the Fripp filler-flats does not require anything more than correlation to that point in the channel of distribution of the domestic merchandise at which the Commission compared prices.[13]

### Conclusion

To repeat, the ITC has broad discretion in carrying out its heavy responsibilities under the Trade Agreements Act of 1979, as amended. However, "the grant of discretionary authority to an agency implies that the exercise of discretion be predicated upon judgment anchored in the language and spirit of the relevant statutes and regulations." *Freeport Minerals Company v. United States,* 776 F.2d 1029, 1032 (Fed. Cir.1985). In *Timken Company v. United States,* 7 CIT 319, 320 (1984) [Available on WESTLAW, 1984 WL 3725] the court stated that the "law is clear that remand is appropriate where an agency has followed an improper method in making a determination or where there has been a defect in the agency's finding", citing *Ford Motor Company v. NLRB,* 305 U.S. 364, 374–75, 59 S.Ct. 301, 307–08, 83 L.Ed. 221 (1939), and *Greene County Planning Board v. Federal Power Commission,* 559 F.2d 1227 (2d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

The defect in the Commission's analysis herein, which makes remand and re-evaluation appropriate, is the absence of substantial evidence supporting comparison of prices entailing freight to two different points in the channels of distribution of the merchandise.

\* \* \*

Now, therefore, in view of the foregoing, it is hereby

---

**13.** The court notes in passing that the "only lost sales documented in the record were at the end user level" [Pub. 1724 at 10] and that of the 20 end-users contacted by the staff, 18 "had reduced their purchases of the U.S.-produced product in favor of the Canadian-produced product and primarily because of price." *Id.* at A–30. No doubt, that price was arrived at based on factors such as freight as well as on others unique to the cooperatives' method of doing business.

ORDERED that plaintiffs' motion pursuant to CIT Rule 56.1 for judgment upon the agency record be, and it hereby is, granted in accordance with the above opinion; and it is further

ORDERED that this matter be, and it hereby is, remanded to the U.S. International Trade Commission for reconsideration in the light of the above opinion of the issue of whether the molded-pulp egg-filler-flat industry in the United States is materially injured by reason of imports of like merchandise from Canada; and it is further

ORDERED that the defendant file any determination of the issue remanded within 45 days hereof, that the plaintiffs have 15 days thereafter in which to respond and that the defendant and the intervenor-defendant have ten days to reply thereto.