**WIELAND WERKE, AG, et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**American Brass, et al., Defendant–Intervenors.**

**Court No. 87–04–00575.**

United States Court of International Trade.

July 10, 1989.

Arnold & Porter (Richard A. Johnson and Christopher M.E. Painter), Washington, D.C., for plaintiffs.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (M. Martha Ries); Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Assistant General Counsel, U.S. International Trade Commission (Calvin H. Cobb, III and Jack M. Simmons, III), Washington, D.C., for defendant.

Collier, Shannon & Scott (David A. Hartquist, Jeffrey S. Beckington and Kathleen Weaver Cannon), Washington, D.C., for defendant-intervenors.

DiCARLO, Judge:

Plaintiffs move pursuant to Rule 56.1 of the Rules of this Court to challenge the decision of the United States International Trade Commission to cumulate less than fair value imports of brass sheet and strip from West Germany with other dumped and subsidized imports and thus determine that an industry in the United States is materially injured by reason of the cumulated imports. *Certain Brass Sheet and Strip from France, Italy, Sweden, and West Germany,* Inv. Nos. 701–TA–270 and 731–TA–313, 314, 316 and 317 (Final), USITC Pub.1951 (Feb.1987). The Court has jurisdiction under 28 U.S.C. § 1581(c) (1982).

Plaintiffs claim they are entitled to judgment on the record because the Commission (1) erroneously and unlawfully cumulated imports notwithstanding conclusive evidence that high-quality West German brass does not compete with other investigated imports; (2) ignored compelling evidence that the domestic industry was highly cyclical; (3) relied on fatally flawed methodologies in making price comparisons which ignored substantial evidence in the record; and (4) failed to investigate discrepancies of material facts, to collect additional data needed to reach a reasoned conclusion, and to verify questionable, self-serving information supplied by the domestic industry.

The Court finds that (1) even if the Commission found that West German imports were of a higher quality, there is sufficient evidence of a reasonable overlap in competition between West German brass sheet and strip and other imported and domestic brass products to support the Commission's determination to cumulate imported brass from West Germany with imports from Brazil, Canada, France, Italy, the Republic of Korea, and Sweden; (2) substantial evidence on the record as a whole supports the Commission's determination that the domestic industry was materially injured "by reason of" investigated imports; (3) the Commission's price comparisons are not "fatally flawed;" and (4) the Commission conducted an adequate investigation.

## DISCUSSION

### I. COMPETITION

Plaintiffs submit that there is no substantial evidence to support cumulation of

**52**

West German brass sheet and strip with other imports, and that if the Commission had examined the causal effects of West German imports alone, it would have found that those imports were not causing any harm to the domestic industry.

To invoke the cumulation statute, the imports to be cumulated must compete with one another and with the domestic like products they allegedly injure. 19 U.S.C. § 1677(7)(C)(iv) (Supp. V 1987); Mock, *Cumulation of Import Statistics in Injury Investigations before the International Trade Commission*, 7 Nw.J.Int'l L. & Bus. 433, 441 (1986). Since there is no dispute that West German brass competed with domestic brass, the issue in this case is limited to review of the Commission's determination that West German brass competed with other imports.

In analyzing whether imports competed with each other, the Commission considered: (1) the degree of fungibility between products; (2) the presence of sales or offers to sell in the same geographic markets; (3) the existence of common or similar channels of distribution; and (4) the simultaneous presence of imports in the market. *Certain Brass Sheet and Strip from Brazil, Canada, and the Republic of Korea*, Inv. Nos. 701–TA–269 and 731–TA–311, 312, and 315 (Final), USITC Pub. 1930, at 12–13 (Dec.1986). The Commission states that these factors are not exhaustive and that no single factor is determinative. *Id.* Rather, the factors are analyzed to determine whether there is a "reasonable overlap" in competition. *Granges Metallverken AB v. United States*, 13 CIT —, 716 F.Supp. 17, 22 (1989); *Fundicao Tupy, S.A. v. United States*, 12 CIT —, 678 F.Supp. 898, 902 (1988), *aff'd*, 859 F.2d 915 (Fed.Cir.1988). Completely overlapping markets are not required. *Florex v. United States*, 13 CIT —, 705 F.Supp. 582, 592 (1989).

Plaintiffs argue that the Commission "completely overlooked and ignored substantial evidence" that German brass is not fungible with other imports because it competes in a separate, high-quality, special characteristic submarket not served by oth-

er imports. *See* R. List 1, Doc. 201; USITC Pub.1951 at A78–79. Plaintiffs argue that the lack of competition is "even clearer" because the German producers offer their customers "just in time" deliveries, special physical characteristics, and consistent quality control which other imports cannot match. *Plaintiffs' Motion for Judgment on the Record*, at 16 n. 5. In the absence of substantial evidence of direct competition between West German and other imports, plaintiffs argue that the Commission's decision to cumulate was unlawful.

The Commission analyzed competition with respect to standard brass sheet and strip by comparing sales of nine categories of brass products, with dimensions identified by the Commission as common denominators in the industry. USITC Pub.1951 at A58, A59, B42; *Granges Metallverken*, 13 CIT at —, 716 F.Supp. at 25. Sales data were available for West German imports in eight of the nine standard categories: products 1 (builder's hardware), 2 (slitting stock 0.02 to 0.25 inch thick), 3 (communications and electronics 0.010 inch to 0.013 inch thick); 5 (slitting stock .016 to .0199 inch thick); 6 (reroll .0061 to .012 inch thick); 7 (reroll .081 to .125 inch thick); and 9 (lamp shells and sockets, 0.011 inch to 0.016 inch thick). USITC Pub.1951 at A58–59, A76–77. Importers sold all of these standard products during the period of investigation. Product 1 was sold by West German, Brazilian, French, Italian, Korean, and Swedish producers. R. List 2, Doc. 731 at A97, B36; *Brazil, Canada, and Korea*, USITC Pub. 1930 at A62. Product 2 was sold by West German, Brazilian, Canadian, French, Italian, Korean, and Swedish producers. R. List 2, Doc. 73, at A95 (table 23); B37 (table E2); *Brazil, Canada, and Korea*, USITC Pub.1930 at A60 (table 23). Product 3 was sold by West German, French, Italian, Korean, and Swedish producers. R. List 2, Doc. 73, A100, A104; B38 (table E3). Product 4 was sold by West German, Brazilian, French, Italian, and Korean producers. *Id.* at A98 (table 26); B39 (table E4); *Brazil, Canada, and Korea*, USITC Pub.1930 at A63. Product 5 was sold by West German, Brazilian, Canadian, Italian,

Korean, and Swedish producers. R. List 2, Doc. 73, at A96 (table 24); B40 (table E5); *Brazil, Canada, and Korea,* USITC Pub. 1930 at A61. Product 6 was sold by West German and French producers. R. List 2, Doc. 73, at A98 (table 26); B41 (table E6). Product 7 was sold by West German, French, and Italian producers. *Id.* at B42 (table E7). Product 9 was sold by West German, Brazilian, French, and Korean producers. *Id.* at A99; B44 (table E9); *Brazil, Canada, and Korea,* USITC Pub. 1930 at A63.

Despite this evidence, plaintiffs argue that high-quality German brass is not fungible with other imports because there is a distinct high-quality submarket comprised of end-users who require special quality or special characteristics for their particular products or applications. *See* R. List 1, Doc. 201, exhibit 2 ¶ 5. These purchasers use brass to manufacture computers, aerospace products, fasteners, hollowware, connectors, and other high-technology applications. R. List 1, Doc. 201, exhibit 3 ¶ 3. Plaintiffs argue that this submarket requires brass of the highest quality in terms of tolerances, surface, chemical and physical conditions, and other specific properties:

> For example, the building hardware sector needs highly polished, mirror brass for some products. Suitable brass ... is available from [only] the West Germans or domestic producers. Others need the high-quality brass, often with unique specifications, to permit the efficient and trouble-free operation of sophisticated machinery which often operate[s] at high speeds and require[s] extremely precise tolerance even though the finished product itself does not require high-quality brass.

*Plaintiffs' Motion for Judgment on the Record,* at 19–20.

Plaintiffs assert that only brass manufactured by German companies, a handful of domestic producers, the Japanese, and the Swedish producers can compete in this submarket because other imports lack the quality and special characteristics needed to compete. R. List 1, Doc. 201, exhibit 2 ¶¶ 3–4; exhibit 3 ¶¶ 10–11. The record indi-

cates, however, that finished West German brass competed for the same sales as imports from Brazil, Italy, Korea, and Sweden. *See Defendant's Response to Motion for Judgment on the Record,* at 27–28 (citations to confidential record omitted). German reroll brass, characterized by "wider size ranges, less stringent surface requirements, and looser dimensional tolerances," also competed with French reroll brass in product categories 6 and 7. R. List 2, Doc. 73 at B41–42.

Plaintiffs also argue that high-quality German brass does not compete with high-quality Swedish brass because Swedish imports "are sold overwhelmingly to special end-use markets not served by German imports." R. List 1, Doc. 201, exhibit 2 ¶ 12; R. List 1, Doc. 266, at 4; R. List 2, Doc. 73, at 20. The record indicates, however, that (i) the Swedes and West Germans both exported standard products 1, 2, 3 and 5, and (ii) at least 4 purchasers bought from both Swedish and West German producers during the period of investigation. *Defendant's Response to Motion for Judgment on the Record,* at 26–27 (citations to confidential record omitted).

> The Commission states further that
> the record indicates that finished West German imports and imports from Brazil, Italy, Korea, and Sweden all competed for the same sales. For example, one purchaser of West German products also purchased products from Italy and Korea, a second purchased products from West Germany and Brazil, while a third purchased products from West Germany as well as Italy and Sweden.... Unlike *Fundicao,* in this case the evidence is uncontested that the same domestic users of brass purchased brass from several importers.

*Defendant's Response to Motion for Judgment on the Record,* at 27–28 (citations to confidential record omitted).

Plaintiffs state that the fact that there are a few purchasers who buy both from West German producers and other investigated countries is not dispositive because these customers purchase each imported product for different uses—German prod-

ucts for high-quality or special specifications use and all other imports for less critical uses. Plaintiffs argue that "the uses, and consequently the competition between suppliers, are distinct." *Plaintiffs' Motion for Judgment on the Record,* at 19 n. 9.

The Commission states that in this case, however, the multiple sourcing data is buttressed by substantial evidence that (i) purchasers specifically interested in quality often purchased brass from several foreign suppliers, and (ii) purchasers frequently bought West German imports based on price or availability, not quantity:

Purchasers interested primarily in quality purchased brass from a variety of import suppliers. One such purchaser, for example, bought brass from Brazil, Canada, Sweden and West Germany, as well as from domestic suppliers. A second purchaser bought brass from domestic, Swedish and West German suppliers because quality was its main concern. A third purchased imported brass from Italy, Sweden and West Germany based on price and quality. Two distributors reported that imports from West Germany, Sweden, France and Italy had comparable superior finish, which is one measure of high quality. Two end users indicated that West German and Swedish gauge control, another measure of quality, was comparable. Conversely, West German brass purchasers cited reasons for sourcing decisions other than quality. For example, one West German import purchaser's primary sourcing factor was price. Four other purchasers bought West German brass because it was lower priced than domestic brass.

Several purchasers commented that imports are equivalent in quality either to West German or domestic brass. One purchaser stated flatly that West German, Brazilian and U.S. brass products were of equivalent quality.

Finally, if the West German product quality were as significant as plaintiffs claim, one would expect the West German producers consistently to have charged a premium price for their product. In fact, the record shows the West

Germans frequently had to price their products equal to or below the price of comparable products offered by other importers. It is quite clear that West German imports "reasonably overlapped" with, and indeed, competed directly against, other subject imports.

*Defendant's Response to Motion for Judgment on the Record,* at 28–30.

■ Even if domestic purchasers perceived West German brass to be of a higher quality, this does not contravene the Commission's determination on this record that West German brass competed with other imported brass in the standard categories. Nor does the record establish that domestic purchasers would pass up higher quality brass available for less than inferior products of other foreign and domestic manufacturers. Competition consists of rivalry in the marketplace, where goods will be purchased from those who provide "the most for the money." *Granges Metallverken,* 13 CIT at ——, 716 F.Supp. at 22 (*quoting* J.P. Friedman, *Dictionary of Business Terms* 109 (1987)). The record supports both the Commission's finding of competition among imported brass and its determination to include West German imports in its cumulative analysis.

The Court finds that the Commission did consider the West German producers' arguments. The Court affirms the Commission's conclusion to cumulate because there is sufficient evidence in the record as a whole of a reasonable overlap in competition among West German and other imports.

## II. CAUSATION OF MATERIAL INJURY

Since the Commission found that West German brass did compete with other imported and domestic brass, the Commission cumulatively assessed the volume and effect of imports and determined that "the domestic industry is materially injured by reason of LTFV imports from France, Italy, Sweden, and West Germany and subsidized imports from France." USITC Pub. 1951 at 13, 17. Plaintiffs challenge the

Commission's determination that the domestic industry was injured by reason of the investigated imports.

The plaintiffs' arguments concerning the Commission's causation analysis in this investigation have already been decided in *LMI—La Metalli Industriale, S.p.A. v. United States*, 13 CIT ——, 712 F.Supp. 959, 971–73 (1989), *appeal filed*, No. 89–1532, —— F.2d —— (Fed.Cir. June 8, 1989). For the reasons expressed in *LMI*, the Court affirms the Commission's determination that the cumulated imports were a cause of material injury to the domestic industry.

## III. METHODOLOGY IN CONDUCTING INVESTIGATIONS

### A. *Three Year Period of Investigation*

Plaintiffs argue that the Commission overlooked evidence that the domestic brass industry is highly cyclical, and challenge the Commission's conclusions that a three-year period of investigation was appropriate.

The Commission has broad discretion to determine appropriate periods of investigation. *British Steel Corp. v. United States*, 8 CIT 86, 93, 593 F.Supp. 405, 411 (1984); *American Spring Wire Corp. v. United States*, 8 CIT 20, 26, 590 F.Supp. 1273, 1279 (1984), *aff'd sub. nom. Armco, Inc. v. United States*, 3 Fed.Cir.(T) 123, 760 F.2d 249 (1985). In their extensive arguments before the Commission, however, the plaintiffs never claimed that the Commission abused its discretion in selecting an appropriate period of investigation. *See* R. List 2, Docs. 29, 45, 50, and 69.

Administrative exhaustion of remedies is generally required before a litigant will be allowed to raise a claim via a civil action. *See* 28 U.S.C. § 2637(d) (1982); *Sharp Corp. v. United States*, 837 F.2d 1058, 1062 (Fed.Cir.1988). The Court has found exceptions to the exhaustion doctrine when requiring exhaustion would be futile, a useless formality, or pursuit of a manifestly inadequate remedy. *Alhambra Foundry Co., Ltd. v. United States*, 12 CIT ——, 685 F.Supp. 1252, 1256 (1988). The Court has also recognized exceptions where judicial interpretations of existing law are decided

after the contested administrative determination, or where the agency did not adhere to controlling judicial precedents. *Id.* An exception has also been found where arguments were based on facts available only in the confidential administrative record and the plaintiff was not timely informed of the deadline for access to the confidential record. *Id.*

■ None of the recognized exceptions apply here. A reviewing court usurps the agency's function when it sets aside a determination upon a ground not previously presented and deprives the agency of an opportunity to consider the matter, make its ruling, and state the reasons for its action. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946); *LMI*, 12 CIT at ——, 712 F.Supp. at 968. In this action, the Court finds it is appropriate to estop the plaintiffs from questioning the reasonableness of the period of investigation for the first time on review. *See Copperweld Corp. v. United States*, 12 CIT ——, 682 F.Supp. 552, 566–67 (1988).

### B. *Industry Cycles*

Plaintiffs claim the Commission "ignored" substantial evidence indicating that any apparent injury to the domestic industry was caused entirely by factors other than investigated imports, suggesting specifically the cyclical nature of the brass industry, the industry's long-term decline because other materials are being substituted for brass, miniaturization which requires less brass, downstream imports of finished brass products, and "the harmful effects of noninvestigated brass imports from Japan and the Netherlands." *Plaintiffs' Motion for Judgment on the Record*, at 54.

The Commission found that cumulative imports were a cause of the material injury suffered by the domestic industry, and thus rejected the proposition that alternative causes offered by plaintiffs, including

industry cycles, were the exclusive causes of injury. In determining material injury by reason of imports, the Commission is not to weigh causes of injury, but is to determine whether imports contribute to conditions of the domestic industry. *LMI*, 13 CIT at ——, 712 F.Supp. at 971.

The Court finds that the Commission did not "ignore" causes of injury, but determined that dumped and subsidized imports were a cause of material injury to the domestic industry. Imports need not be the only cause of harm. *Florex v. United States*, 13 CIT ——, 705 F.Supp. 582, 593 (1989). Additionally, by including "noninvestigated brass imports from Japan and the Netherlands" as a source of injury to the domestic industry, the plaintiffs recognize that the Commission could find that imports are a cause of material injury.

### C. *Price Comparisons to Find Underselling*

■ Plaintiffs assert that the Commission improperly compared only non-toll domestic sales to imports and eliminated domestic sales at lower prices because of large volume quantities. Plaintiffs assert that the comparison of import sales with domestic non-toll sales alone resulted in the false appearance of substantial underselling.

Domestic brass mills often obtain brass through "tolling" arrangements, whereby customers purchase raw materials in the open metal market, transport them to the brass mills, and pay the mills to convert the raw materials into brass sheet and strip. USITC Pub.1951 at A5, A56. "Toll sales" thus refer to metal-conversion contracts where the purchaser supplies the raw metal to the mill and pays for only the fabrication. *LMI*, 13 CIT at ——, 712 F.Supp. at 972; USITC Pub.1951 at 14, A56. Sales of imported brass on a toll basis are rare, however, as a purchaser who wanted to buy imported toll brass would have to arrange to purchase metal on the open market and have it delivered to the foreign producer. *LMI*, 13 CIT at ——, 712 F.Supp. at 972; USITC Pub.1951 at A56 & n. 3. Virtually all imported brass is sold on a "nontoll" basis without customers providing raw materials. *See, e.g.*, R. List 2, Doc. 74, at 6; USITC Pub.1951 at 16–17, A56–58.

To analyze pricing trends, the Commission compared fabrication prices of four product categories sold by domestic producers on a toll and a nontoll basis. The Commission gathered price data for imported and domestic nontoll products, and comparable toll products. After considering arguments with respect to comparing import prices to domestic prices, the Commission determined that the most appropriate comparison was between domestic nontoll and imported nontoll prices. The Commission concluded that domestic toll fabrication prices increased or remained stable, while domestic nontoll fabrication prices declined as a result of competition with imported nontoll products.

Plaintiffs argue that there is substantial evidence in the record indicating that if the Commission was going to make price comparisons which considered toll and nontoll sales separately, the sales of imported brass were most comparable to domestic toll sales. Plaintiffs state that domestic toll sales are not insulated from import competition and argue that imports compete largely with domestic toll sales. Plaintiffs advocate comparing import prices, which are set on a nontoll basis, with domestic toll prices rather than domestic nontoll prices. Plaintiffs argue that at the very least, the Court must remand with instructions to "employ a reasonable methodology." *Plaintiffs' Reply Brief*, at 17.

Domestic toll prices tend to be lower than domestic nontoll prices because toll purchasers tend to be larger, more sophisticated, and more valued customers than nontoll purchasers. The Commission states that it rejected plaintiffs' proposal to construct a fictitious price from domestic toll fabrication prices for a number of reasons:

First, tolling is considerably more complex than an "administrative billing procedure." While a small number of large volume brass purchasers are sophis-

ticated enough to play the metal market and enter into a toll relationship with a brass producer, the Commission found that the toll market is insulated from the nontoll market. The decision to purchase brass on a toll basis depends on the ability to acquire and transport raw materials *and* the purchaser's willingness to assume the metal market risk. As established by the divergent price trends, exclusion of domestic toll sales was appropriate because imports had no price effect on domestic toll sales.

Second, plaintiffs' principal rationale for comparing domestic toll prices with import prices is that import nontoll and domestic toll sales allegedly were of similar transaction volume. The Commission's methodology, however, accounted for variations in transaction volume. Moreover, it is not at all clear, as plaintiffs claim, either that imports are all sold in large volumes, or, that large volume sales are necessarily made at lower prices. Transaction volumes of imports varied and in many cases were comparable to volumes of domestic nontoll products. Indeed, the Commission noted that importers departed from their minimum delivery requirements, and that the effect of minimum requirements was mitigated by the fact that different products could be mixed into the same minimum order. The Commission concluded that "differences in transaction quantities are not necessarily meaningful indicators of quantity discounts received by customers." In the face of this mixed record, no clear adjustment to prices was possible.

*Defendant's Response to Motion for Judgment on the Record*, at 46–48.

Plaintiffs also contend that the Commission erred in comparing import nontoll prices with domestic nontoll prices because imports are sold in large-volume contracts, while domestic nontoll sales are primarily smaller-volume "spot" sales. Plaintiffs state that "[l]arger quantities of imports result in volume discounts not reflected in domestic prices and different contractual terms often alter the negotiated price sub-

stantially." *Plaintiffs' Motion for Judgment on the Record*, at 40.

The Commission points out that the record is mixed with respect to transaction volume of imports and the generalization that imports are uniformly sold in large volumes is not supported by the record. Furthermore, the allegation that foreign producers do not compete for "spot" sales is contradicted in the record. Four importers reported that they sell exclusively on a spot basis and only two importers sell more than half their products on a contract basis. *See Defendant's Response to Motion for Judgment on the Record*, at 49 (citations to confidential record). Additionally, that Commission states that because it was unable to assume that contract deliveries would be larger than spot deliveries, or that contract prices would be lower than spot prices, there is no rational basis on which to make the price comparisons suggested by the plaintiffs. *Id.* at 51.

The Court finds that the Commission properly declined to construct an artificial price from a series of subjective intangibles where actual market prices for comparable products were available for comparison. In this investigation, the Commission found that while domestic brass is sold, in significant percentages, both on a toll and nontoll basis, imported brass is sold almost exclusively on a nontoll basis. USITC Pub.1951, at A56. This finding of fact is not challenged by the plaintiffs. The Commission further found that "cumulated imports competed exclusively for nontoll account sales." *Id.* at 16–17. The question is not which sales are more alike in certain respects, but which ones are competing in the market. When comparing the price of United States goods with the price of imports, the Commission must compare prices at the level of actual competition in the United States market. *Maine Potato Council v. United States*, 9 CIT 293, 301, 613 F.Supp. 1237, 1245 (1985). The Commission's comparison of nontoll import prices with nontoll domestic prices is according to law and is supported by substantial evidence on the record as a whole.

### D. *Significance of Import Volume Trends*

Plaintiffs argue that there is no causal link between imports and injury to the domestic industry because import volume increased in 1984 and then decreased, while operating income for the domestic industry also increased in 1984 and then declined. Moreover, plaintiffs argue, when import volume peaked in 1984, domestic prices increased, while when imports dropped in 1985, domestic prices also dropped.

Plaintiffs' first argument was specifically rejected in *British Steel*, 8 CIT at 96, 593 F.Supp. at 413. Because the Commission's analysis accounts for a variety of factors, a significant volume of imports can be a cause of material injury to the domestic industry, whether or not import volume is increasing or decreasing at particular times. Here the Commission found that absolute import volume was substantial and significant over the period of investigation. USITC Pub.1951 at 17.

■ Second, the effect of imports on domestic prices is not necessarily directly related to increases and decreases in import volume as plaintiffs imply, but depends, as found by the Commission, on a number of factors including underselling. *Id.* at 14–15. The evidence of direct competition, underselling, lost sales and revenue data support the causal link found by the Commission between imports and material injury to the domestic industry.

### E. *Product Categories*

Plaintiffs argue that the nine categories of brass products selected by the Commission were overly broad and otherwise flawed. The Commission's selection of the product categories in this investigation has already been affirmed. *Granges Metallverken*, 13 CIT ——, 716 F.Supp. at 25.

### F. *Domestic Scrap Buy–Back Programs*

■ Plaintiffs complain that the Commission failed to account for a quantifiable competitive advantage enjoyed by domestic producers who agree to repurchase scrap from their customers. Plaintiffs claim that the domestic producers' scrap buy-back programs are effectively price discounts and are worth a substantial amount:

> Despite the clear instructions of the Commission's Producer Questionnaire that reported prices must be net of all discounts and rebates, the responses from the domestic producers misleadingly fail to provide prices net of the scrap buy-backs. In addition to seriously undermining the credibility of the domestic responses, this discount must be deducted from the domestic mills' reported prices to arrive at a defensible domestic price for purposes of comparing it with the prices of imports. Despite a clear showing of its importance, no such adjustment was made for this discount.

*Plaintiffs' Motion for Judgment on the Record*, at 42–43. Plaintiffs state that purchasers view the buy-back of their generated scrap as an inducement and a term of sale. Plaintiffs argue that "[t]he fact that not all purchasers can take advantage of scrap repurchase options does not excuse the domestic industry from reporting scrap repurchase premiums for reported sales to purchasers who can and do take advantage of the premiums." *Plaintiffs' Reply Brief*, at 20. Without citing any support in the record, plaintiffs make the claim that domestic firms "quote their customers a higher price for brass strip with the clear understanding that the customer will be permitted to sell back scraps generated by using the purchased brass at a price which is well above prevailing market prices for scrap." *Id.* at 19.

The Commission states that a scrap buy-back program would not be an advantage unless the scrap seller receives a premium over the market value of scrap.

The record shows that scrap buy-back programs do not apply to all purchasers of domestic brass, and not all domestic producers have such programs. R. List 2, Doc. 73, at B47; R. List 2, Doc. 74, at 8–9. The record also shows that foreign producers repurchase scrap. R. List 2, Doc. 74, at 9. Any competitive advantage, therefore, is not as well-supported in the record as plaintiffs suggest.

The Court finds no error by the Commission in not making an adjustment under 19 U.S.C. § 1677(7)(C)(ii)(I) (1982) for scrap buy-back programs. As stated in *British Steel Corp. v. United States*, 8 CIT 86, 95, 593 F.Supp. 405, 412 (1984), the relevant statute "focuses solely on *prices* and does not mandate any *cost* analysis or adjustment of prices for cost factors respecting the purchase of the imported product." The record shows that domestic producers charge the same price for brass products whether or not customers enter into scrap buy-back arrangements, and no purchaser listed scrap buy-back programs among their major purchasing considerations. R. List 2, Doc. 74, at 9.

### G. *Fixing Metal Value*

The Commission noted that several sales practices have evolved for handling the metal value component of sales prices for brass sheet and strip, each varying the proportion of market risk borne by the purchaser in a market in which significant price fluctuations can occur in a short time. R. List 2, Doc. 73, at A77. The Commission declined to make price adjustments based on metal fixing practices.

Plaintiffs complain that the Commission failed to "comprehend the significance" of different practices of fixing metal values, and state that foreign producers

usually "fix" the metal price on the date of order booking while U.S. producers set it on the date of shipment. Given the lead times involved in producing the product, the prices reported reflect different dates of metal fixation and the Commission's quarterly [price] comparisons are not based on contemporaneous price competition between imports and domestic mills.

*Plaintiffs' Motion for Judgment on the Record*, at 43. Plaintiffs also note that all producers regard metal as a "pass through" value:

This component of price varies only with the daily quotation for the metal on international metal exchanges depending on

the date when the metal price is "fixed," *i.e.*, becomes contractually binding. *Id.* at n. 37.

The Commission points out that any adjustment to prices would have been against the interest of plaintiffs. Foreign producers tend to fix the metal value of an order at the time of the order, while domestic producers tend to fix the metal value at the time of shipment. R. List 2, Doc. 74, at 11. Over the period of investigation, metal values declined. R. List 2, Doc. 73, at A76. Thus, all other things being equal, by fixing metal values at the time of order, which can be three to four months before delivery, imports ordered on the same day as domestic products will tend to fix their metal values earlier and at a higher price. In effect, the earlier metal-value-fixing practice of foreign producers results in higher metal values for a comparable order, and thus a higher total delivered selling price. *Id.* at A93. Higher import prices reduce the chance that the Commission would find underselling. Import prices would be even lower if the Commission had adjusted them downward to account for disparate metal value fixing practices.

### H. *Lead Time*

Plaintiffs advocate price adjustments for longer lead times of foreign producers, assuming that domestic lead times were shorter and that lead times affect prices. The Commission did not make a price adjustment for lead times.

The evidence with respect to domestic lead time advantage is not as clear as plaintiffs claim. One purchaser reported a two-week average lead time for imported West German material. USITC Pub.1951 at B43. Two other purchasers reported four-week average lead times for German material. *Id.* Over the period of investigation, domestic lead times increased substantially, while import lead times shrank. R. List 2, Doc. 69, at 3. The purchaser data on lead times shows that the range of domestic lead times was one to twelve weeks while the range of West German imports was two to twenty weeks. R. List 2, Doc. 73, at

A110. These ranges overlap considerably, and suggest that for substantial periods during the period of investigation, importers' lead times were comparable to domestic lead times. Substantial evidence on the record supports the Commission's statement that it would "not necessarily expect prices of ... German brass sheet and strip to be discounted because of longer lead times." USITC Pub.1951 at B43. The Court finds that the Commission did not err in refusing to make price adjustments for allegedly longer lead times of foreign producers. *See British Steel Corp.,* 8 CIT at 95, 593 F.Supp. at 412 (upholding the Commission's refusal to adjust import prices to account for import lead times).

## IV. ALLEGED FAILURE TO COLLECT ADEQUATE DATA

■ Plaintiffs argue that the Commission's determination is unsupported by substantial evidence and contrary to law because the Commission failed to gather adequate data.

### A. *Methodology*

Congress has set no minimum standard by which to measure the thoroughness of a Commission investigation, *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 134–35, 744 F.2d 1556, 1561 (1984), and the Commission has broad discretion to pursue an investigation in a manner that will provide substantial evidence for its determinations. *Negev Phosphates, Ltd. v. United States,* 12 CIT ——, 699 F.Supp. 938, 950–51 (1988); *Alberta Pork Producers' Mktg. Bd. v. United States,* 12 CIT ——, 683 F.Supp. 1398, 1402 (1988). Although the failure to collect pertinent data may constitute an abuse of an agency's discretion, *Timken Co. v. United States,* 10 CIT 86, 97, 630 F.Supp. 1327, 1337–38 (1986), the plaintiffs have not established that the Commission's determination is unsupported by substantial evidence, nor pointed to any procedure or methodology employed by the Commission in these investigations which exceed its discretion. *See Granges Metallverken,* 13 CIT at ——, 716 F.Supp. at 25.

### B. *Other Evidence of Record*
#### 1. *General Selling and Administrative Data*

Plaintiffs point to the dissenting opinion of the Vice Chairman, who mentioned that there may be an allocation problem regarding general selling and administrative (GS & A) expense data reported by the domestic industry. USITC Pub.1951 at 40 n. 11. Plaintiffs state that there is a strong suggestion that the data is inaccurate and that domestic producers did not properly allocate their costs between investigated brass and the myriad of other products they manufacture. The plaintiffs thus conclude that the GS & A data call into question the reliability of (1) all data provided by the domestic industry and (2) the calculation of operating income relied upon by the majority. *Plaintiffs' Motion for Judgment on the Record,* at 59.

The Commission requested domestic producers to describe the method used to allocate income and loss data between overall operations and C20000 series production. *See, e.g.,* R. List 2, Docs. 76.51 and 76.52. While the Commission observed that "[s]ales, gross profit, operating income, and cash flow all fell below, and in some instances significantly below, 1983 levels in 1985," there is no evidence that the Commission relied heavily on operating income data to reach this conclusion. USITC Pub. 1951 at 11 n. 26 (incorporating by reference *Brazil, Canada, and Korea,* USITC Pub. 1930 at 11). To the contrary, each Commissioner could evaluate the method used to allocate GS & A and rely on such data accordingly. *See* USITC Pub.1951 at 40–41 n. 11 (Vice Chairman Brunsdale, dissenting) ("[w]hether or not there is an allocation problem does not affect my decision ...").

Plaintiffs' conclusion that all data provided by petitioners is questionable has no basis in the record. Plaintiffs have failed to establish that the domestic industry's GS & A data is wrong, or to establish any pattern of inaccurate reporting on the part of the domestic industry, or that the Commission relied on any inaccurate data. The plaintiffs had every opportunity to present data to the Commission, and all of the

arguments and data presented were considered by the Commission. Plaintiffs' arguments concerning GS & A data do not detract from the substantial evidence supporting the Commission's determinations.

### 2. *Capacity And Capacity Utilization Data*

Plaintiffs argue that the domestic capacity and capacity utilization figures are questionable and may reflect arbitrary and self-serving allocations because the equipment used to produce the investigated brass can be used to produce a number of other products. Plaintiffs claim the Commission relied on this questionable data without further investigation or verification. USITC Pub.1951 at 10–11; *Brazil, Canada, and Korea,* USITC Pub.1930 at 10–11.

The Commission was aware of the potential problem of separating C20000 brass data from capacity and capacity utilization data for the overall establishment. In *Brazil, Canada, and Korea,* the Commission noted:

> Much of the equipment used to produce C20000–series brass sheet and strip can also be used to produce other types of brass sheet and strip. Most of the questionnaire responses did not or could not separate these data. Consequently, the most important statistic is total capacity.

USITC Pub.1930 at 10 n. 29; R. List 2, Doc. 47, at 16. The staff cautioned the Commission that the reported capacity data "is heavily influenced by product mix ... and do not clearly indicate the extent of equipment addition or dismantling that would normally lead to capacity variations." R. List 2, Doc. 73, at A33. The Commission thus concluded that based on this overlapping function of brass equipment, it was difficult for the domestic industry to calculate its capacity to produce C20000 brass alone. As a result, the Commission's analysis of this economic indicator is not as useful as is normally the case. USITC Pub.1951 at 10 n. 29.

The Court finds that the Commission recognized the limitations in the data's usefulness, and tempered its reliance on the data accordingly. Plaintiffs have not established that the Commission's determination is unsupported by substantial evidence on the record as a whole. Rather, the Commission acted reasonably in gathering the data, identifying its inherent weaknesses, and tempering its reliance on the data.

### 3. *Other "Objective" Data*

Plaintiffs assert that objective data indicate higher domestic shipments over the period of investigation, which would affect import market share and bring into question the shipment data reported by the domestic industry.

The Commission points out that the "objective" source of this data is the plaintiffs' own economic consultant, who calculated shipments using figures from the Copper Development Association (CDA) which were adjusted by Census of Manufacturer data. Aside from the distortion invited by using adjusted data collected for other purposes, and the fact that the consultant's figures were prepared solely to support the position of the respondents, the Commission states that it reasonably rejected this data for several reasons.

> First, ... the Commission is entitled to rely on the data it collects, which is submitted under penalty of perjury, and is routinely examined by the staff. Second, as mentioned above, uncontroverted testimony indicates that CDA data is of questionable reliability because (i) domestic shipment data include products not covered by these investigations, including brass plate and foil; (ii) CDA shipment data by end use category include C30000, C40000, C60000 series brass and high performance copper alloys not subject to investigation; (iii) not all of the domestic producers have consistently reported data to the CDA; and (iv) CDA data are compiled from companies whose identities were not provided to the Commission, such that the Commission could assess the validity of the data. Third, Census data is widely divergent from CDA data. In sum, the "objective data" offered by plaintiffs are neither objective nor reliable, and were properly rejected by the Commission.

*Defendant's Response to Motion for Judgment on the Record,* at 69–70.

The Court finds that the Commission reasonably declined to rely upon data that it perceived to be neither objective nor reliable.

Plaintiffs also indicate that public investment data gathered by their economic consultant conflicts with data gathered by the Commission. *Plaintiffs' Motion for Judgment on the Record,* at 62–63. The Court finds that the Commission is entitled to rely on its own data, and need not rely on public data gathered for a wholly different purpose just because it is submitted by a party to a proceeding.

#### 4. *Service Centers*

Plaintiffs complain that the Commission did not attempt to gather evidence on metal service centers, which allegedly comprise the most dynamic segment of the brass industry and are transforming competition. *Plaintiffs' Motion for Judgment on the Record,* at 63.

The Commission did not find that service centers are part of the domestic industry, and plaintiffs did not challenge the Commission's domestic industry determination. The Commission states that whether metal service centers constitute the most dynamic segment of the brass industry has no bearing on whether the Commission's like product or domestic industry determinations are supported by substantial evidence. The record shows that the Commission heard extensive argument on the service center issue. R. List 1, Doc. 201, at 50–51, 103, 106–12; R. List 2, Doc. 58. The Court finds that the Commission did consider the plaintiffs' service center arguments, but declined to include service centers in its investigation.

#### 5. *Unrecorded Telephone Call*

Plaintiffs claim that after one Commissioner asked the staff to request data on West German capacity utilization, a staff member telephoned counsel for West German producers and indicated that no additional data was provided. Plaintiffs conclude that because this call was not registered in the log, the staff "misled the Commission into thinking a more thorough investigation was conducted than in fact occurred." *Plaintiffs' Motion for Judgment on the Record,* at 64.

Even if plaintiffs are correct in their deduction, the thoroughness of the investigation on this point was not determinative of Commissioner Eckes' vote. Foreign capacity data is relevant only to a threat of injury determination. Since the Commission made an injury determination rather than a threat determination, the Court finds the alleged failure to record the calls is at most harmless error.

### CONCLUSION

The Court finds that there is sufficient evidence of a reasonable overlap in competition to support the Commission's determination to cumulate imports of brass sheet and strip from West Germany with dumped and subsidized imports from other countries. The Commission's material injury determination in *Certain Brass Sheet and Strip from France, Italy, Sweden, and West Germany,* Inv. Nos. 701–TA–270 and 731–TA–313, 314, 316, and 317 (Final), USITC Pub.1951 (Feb.1987), as it applies to brass sheet and strip products imported from the Federal Republic of Germany, is supported by substantial evidence on the record as a whole and is according to law.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision; now in conformity with that decision,

IT IS HEREBY ORDERED that this action is dismissed.