Slip Op. 05-108

United States Court of International Trade

```
_____
SIDERCA S.A.I.C., ET AL.,          |
                                   |
          Plaintiffs,              |
                                   |
v.                                 |
                                   |
UNITED STATES,                     | Before: Pogue, Judge
                                   |
          Defendant,               |
                                   | Consol. Court No. 01-00692
     and                           |
                                   |
NEWPORT STEEL CORPORATION;         |
MAVERICK TUBE CORPORATION; LONE    |
STAR STEEL COMPANY, INCORPORATED;  |
KOPPEL STEEL CORPORATION; IPSCO    |
TUBULARS, INCORPORATED; GRANT      |
PRIDECO, INC.; UNITED STATES STEEL |
CORPRATION,                        |
                                   |
          Defendant-Intervenors.   |
_____|
```

OPINION

[ITC's remand determination sustained.]

Dated: August 26, 2005

White & Case, LLP (David P. Houlihan, Gregory J. Spak, Richard J. Burke, Lyle B. Vander Schaaf, and Joanna M. Ritcey-Donohue) for the plaintiff.

James M. Lyons, Acting General Counsel, Andrea C. Casson, Acting Assistant General Counsel for Litigation, U.S. International Trade Commission, (Peter L. Sultan) for the defendant.

Schagrin Associates (Roger B. Schagrin) for defendant-intervenors Newport Steel Corporation, Maverick Tube Corporation, Lone Star Steel Company, Koppel Steel Corporation, IPSCO Tubulars, Incorporated, and Grant-Prideco, Incorporated.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E.

Lighthizer, John J. Mangan, James C. Hecht, and Stephen P. Vaughn) for defendant-intervenor United States Steel Corporation.

Pogue, Judge: Plaintiffs, Siderca S.A.I.C. ("Siderca"), Dalmine S.p.A. ("Dalmine"), and NKK Tubes challenge the remand determination of Defendant, the U.S. International Trade Commission ("the ITC"), in the sunset review of antidumping orders on oil country tubular goods ("OCTG") from Argentina, Italy, Japan, Korea, and Mexico. Plaintiffs allege that aspects of the ITC's determination are not in accordance with law and unsupported by substantial record evidence.

BACKGROUND

In August of 1995, following the ITC's finding that U.S. producers of OCTG were being materially injured by competition from dumped imports, see Oil Country Tubular Goods from Argentina, Austria, Italy, Japan, Korea, Mexico, and Spain, USITC Pub. 2911, Inv. Nos. 701-TA-363 and 364 (Final) and 731-TA-711-717 (Final), P.R. List 1, Doc. No. 116 at I-3 (Aug. 1995) ("Original Determ."), the United States Department of Commerce imposed antidumping orders on OCTG from Argentina, Italy, Japan, Korea, and Mexico. See Oil Country Tubular Goods from Argentina, 60 Fed. Reg. 41,055 (Dep't Commerce Aug. 11, 1995) (antidumping duty order); Oil Country Tubular Goods from Italy, 60 Fed. Reg. 41,057 (Dep't Commerce Aug.

11, 1995) (antidumping duty order); Oil Country Tubular Goods from Japan, 60 Fed. Reg. 41,058 (Dep't Commerce Aug. 11, 1995) (antidumping duty order); Oil Country Tubular Goods from Korea, 60 Fed. Reg. 41,057 (Dep't Commerce Aug. 11, 1995) (antidumping duty order); Oil Country Tubular Goods from Mexico, 60 Fed. Reg. 41,056 (Dep't Commerce Aug. 11, 1995) (antidumping duty order).  Five years later, pursuant to 19 U.S.C. § 1675(c) (2000), the ITC instituted a sunset review to determine whether revocation of the antidumping orders would likely lead to the recurrence of material injury to U.S. OCTG producers within a reasonably foreseeable period of time.  See 19 U.S.C. § 1675a(a)(1)[1]; Seamless Pipe from Argentina, Brazil, Germany, and Italy and Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico, 65 Fed. Reg. 63,889 (ITC Oct. 25, 2000) (notice of Commission determinations to conduct full five-year reviews concerning the countervailing duty order and antidumping duty orders on seamless pipe from Argentina, Brazil, Germany, and Italy and the countervailing duty order and antidumping duty orders on oil country tubular goods from

_____

[1]Title 19 U.S.C. § 1675a(a)(1) states, in part:

(1) In general.
   In a [sunset review], the Commission shall determine whether revocation of an order, or termination of a suspended investigation, would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time.  The Commission shall consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked or the suspended investigation is terminated.

Argentina, Italy, Japan, Korea, and Mexico) ("Review Notice"). The ITC cumulated the volume and effect of imported OCTG from the five reviewed countries; the ITC then found that, in the event of revocation of the antidumping order, these cumulated imports would likely cause recurrence of material injury to U.S. OCTG producers within a reasonably foreseeable time. See Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico, Inv. No. 701-TA-364 (Review) and 731-TA-711 and 713-716 (Review), C.R. List 2, Doc. No. 91 at 1, 24 (June 29, 2001) ("Commission's Views").

Plaintiffs, subject producers of OCTG,[2] challenged the ITC's determinations before the Court, arguing that the ITC's interpretation of the word "likely" in its governing statute was not in accordance with law, and that there was not substantial evidence to support many of ITC's substantive findings.

The court remanded the ITC's determination so that the agency could explain how it understood and applied the statutory term "likely" in making its determination. The ITC affirmed on remand its finding that recurrence of material injury to the domestic industry would be likely in the event of revocation of the antidumping order. After remand, plaintiffs again challenge the agency's interpretation of the word "likely", as well as the quantum of evidence supporting the agency's substantive findings.

_____

[2]Siderca is an Argentine producer of OCTG. Dalmine is an Italian producer. NKK Tubes is a Japanese producer. Commission's Views, C.R. List 2, Doc. No. 91 at 3.

STANDARD OF REVIEW

The Court reviews the ITC's determinations in sunset reviews to ascertain whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); see also 19 U.S.C. § 1516a(a)(2)(B)(iii).

DISCUSSION

The court first evaluates the challenge to the ITC's interpretation of the word "likely"; it then goes on to discuss whether substantial evidence supports the agency's substantive findings.

1.  The "Likely" Standard

The word "likely" has a place of high importance in the statute governing sunset reviews. See 19 U.S.C. § 1675a. Indeed, that term is the fulcrum upon which most of the decisions that the agency is required to make in a sunset review turn. For example, the ITC must determine whether material injury is "likely" to continue or recur. See 19 U.S.C. § 1675a(a)(1).

Various opinions of the Court have held that the term "likely"

should be interpreted to mean "probable," or, put another way, "more likely than not." <u>See, e.g.</u>, <u>AG der Dillinger Hüttenwerke v. United States</u>, 26 CIT 1091, 1100-1101, 1101 n.14 (2002) (explaining that in a countervailing duty sunset review, to satisfy a "likely" standard, a thing must be shown to be "probable," or "more likely than not"); <u>Usinor Industeel, S.A. v United States</u>, 26 CIT 467, 474-75 (2002) ("<u>Usinor I</u>"), <u>Usinor Industeel, S.A. v United States</u>, 26 CIT 1402, 1403-04 (2002), affirmed at 112 Fed. Appx. 59 (Fed. Cir. 2004) (rejecting argument that "likely" means something between "possible" and "probable"). In light of previous cases dealing with contemporaneous reviews finding that the ITC may have employed the wrong standard, contemporaneous statements by the ITC arguing for or advancing a "possible," rather than a "probable" standard, and the lack of discussion of the issue in the determination itself, the court directed the agency on remand to indicate what standard it had actually used, and if the standard used was incorrect, to revisit its determinations accordingly. <u>See</u> Order Remanding Court No. 01-692 to the ITC (April 5, 2005).

In its remand determination, the ITC states "[i]n our original views in these reviews we applied a 'likely' standard that is consistent with how the Court has defined that term in <u>Siderca, S.A.I.C. v. United States</u>, 28 CIT __, 350 F. Supp. 2d 1223, 1243 (2004) as well as in prior opinions addressing this issue." Response of the Commission to Remand Order at 2, Attach. to Letter

from Peter L. Sultan, Counsel for Defendant, to the Hon. Donald C. Pogue, Re: Siderca, S.A.I.C., et. al. v. United States, Consol. Ct. No. 01-692 (June 6, 2005).  The court will accept this statement as an assertion that the evidence amassed and cited by the agency is such as to meet or surpass the burden under the "probable" standard.  Therefore, at this juncture, the only way in which the agency's statement can be measured is by the sum of record evidence that supports the agency's determinations here.  See Siderca, S.A.I.C. v. United States, 29 CIT __, Slip Op. 05-64 at 5-6 (June 9, 2005).

## 2.  Substantial evidence

Plaintiffs challenge whether the evidence compiled by the ITC is sufficient to support its conclusions on a number of issues. First, plaintiffs challenge the ITC's determination to cumulate imports from Argentina, Italy, Japan, Korea, and Mexico. Second, plaintiffs challenge the evidence supporting the agency's determination that, taken together, (1) the likely volume of subject imports, (2) the likely price effects of subject imports, and (3) the likely impact of subject imports, are such as to lead to a recurrence of material injury to domestic manufacturers of OCTG within a reasonably foreseeable time.  The court addresses the two issues in turn.

A. *Cumulation*

In a sunset review proceeding, the ITC may cumulate subject imports from all countries with respect to which [sunset reviews] were initiated on the same day, if certain other elements are satisfied. See 19 U.S.C. § 1675a(a)(7). First, the ITC must determine whether the imports from each country would be likely to have no discernible impact on the U.S. market. See id. Second, the ITC must find that the imports it seeks to cumulate would likely compete with each other and with the domestic product. See id. Here, there is no question that sunset reviews for OCTG from Argentina, Italy, Japan, Korea, and Mexico were initiated on the same day. See Review Notice, 65 Fed. Reg. at 63,889. However, plaintiffs challenge whether certain of these countries' imports would have a discernible adverse impact and moreover whether they would likely compete with each other and with the domestic product.

*I. Discernible adverse impact*

Regarding discernible adverse impact, plaintiffs argue that Italy's imports comprised only a very small percentage of the imports to the U.S. market in the original investigation. Pls.' Initial Br.: Mem. Pts. & Auths. Supp. Pls.' Mot. J. Agency Rec. 36 ("Pls.' Mot."). Moreover, plaintiffs argue that Arvedi, one of the Italian producers investigated in the original proceedings, has since ceased to manufacture OCTG, that the record shows that the demand for OCTG in Italy is increasing, such that Dalmine, the remaining Italian producer (and a plaintiff here) would have little

motivation to export to the U.S. in the event that the order is revoked, and that, at any rate, Dalmine is operating nearly at capacity. Id. (citing Pre-Hearing Brief of Dalmine SpA from Italy, Attach. to Letter from David P. Houlihan to the Hon. Donna R. Koehnke, Secretary, ITC, Re: Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico, Inv. Nos. 701-TA-364 and 731-TA-711, 731-TA-713-716 (Reviews), C.R. List 2, Doc. No. 38 at 1 (April 27, 2001) ("Dalmine Pre-Hearing Br."). Plaintiffs characterize the ITC's determination that Italy's imports would likely have a discernible adverse impact as based solely on the finding that Dalmine maintains an active channel of distribution in the United States. See id. at 36-37.

The ITC's determination evidences that Italy's imports during the period of the original investigation accounted for only a tiny portion of apparent U.S. consumption of OCTG. See Commission's Views, C.R. List 2, Doc. No. 91 at 17. However, the ITC argues that its determination regarding Italy is based on more than its finding that Italy maintains an active channel of distribution in the U.S. See Def.'s Opp'n Pls.' Mot. J. Agency Rec. 19-20 ("Def.'s Opp'n"). The determination states that "[p]roducers in each of the subject countries continue to produce and export . . . volumes of the subject casing and tubing." Commission's Views, C.R. List 2, Doc. No. 91 at 18. The determination also states that the subject producers can "produce other tubular products on the same machinery

used to produce the subject merchandise and can shift production between the subject merchandise and other products." Id.[3] Further, the determination appears to state that prevailing conditions of competition in the U.S. market, specifically the importance of price considerations among U.S. buyers of OCTG, would give subject producers an incentive to import. See Commission's Views, C.R. List 2, Doc. No. 91 at 18, 18 n.57 (citing Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico, Staff Report to the Commission on Investigations Nos. 701-TA-364 (Review) and 731-TA-707-711 and 713-716 (Review), Attach. to Mem. from Lynn Featherstone, Director, Office of Investigations, to the Commission, Re: Investigations Nos. 701-TA-364 (Review) and 731-TA-711 and 713-716 (Review): Oil Country Tubular Goods from Italy Argentina, Italy, Japan, Korea, and Mexico – Staff Report (May 31, 2001), C.R. List 2, Doc. No. 87 at Page II-27 ("Staff Report")).

In addition, the determination appears to answer the plaintiffs' objections. First, it relies only on data from

_____

[3]At first glance, it appears that neither this statement nor the one preceding it are supported by citation to the record. Such failure of citation might present a serious problem, but similar statements are made by the ITC elsewhere in the determination, and appear in conjunction with appropriate record citations. See Commission's Views, C.R. List 2 Doc. 91 at 27, 27 nn.100-101 & 30, 30 nn.111, 113-115 & 31, 31 nn.116-117 & 35, 35 n. 136. While the court feels that the ITC must endeavor to be more thorough with its citations in future determinations, it appears that, considered in light of these other record citations, the ITC has not made any conclusory statements here.

Dalmine, rather than data from Arvedi, the Italian producer that ceased production. Indeed, as Arvedi did not participate in this review, see Commission's Views, C.R. List 2, Doc. No. 91 at 3-4, there is no information from Arvedi upon which the Commission could have relied. Second, while the plaintiffs cite Dalmine's own contention that demand for OCTG in its home market is high and increasing, Dalmine Pre-Hearing Br., C.R. List 2, Doc. No. 38 at 1, the record evidence shows that Dalmine has actually sold less and less OCTG internally each year. See Staff Report, C.R. List 2, Doc. No 87 at Table IV-6). Exports, on the other hand, comprise the majority of its sales. See Commission's Views, C.R. List 2, Doc. No. 91 at 35, 35 n.136 (citing Staff Report, C.R. List 2, Doc. No 87 at Table IV-6). Finally, although Dalmine may be operating at near capacity in its production of OCTG, the ease with which OCTG producers can switch other lines over to the manufacture of OCTG means that high capacity utilization on OCTG does not necessarily result in an insurmountable cap on OCTG production. See Commission's Views, C.R. List 2, Doc. No. 91 at 27 n.100, n.101 & 29 n.112.

Accordingly, it appears that while Italy's imports to the U.S. have historically been small, Italy maintains the ability to export product to the U.S. in an amount that would be discernible. Moreover, Italy is actually dependent on exports for the majority of its OCTG sales. Finally, given the importance of price

considerations to U.S. purchasers of OCTG, Italy may have an incentive to export OCTG to the U.S. in the event of revocation. This evidence appears to the court to satisfy the standard that "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (citations omitted).

### ii. Likely competition

However, the plaintiffs here also challenge the ITC's determination that subject imports would likely compete with each other and with the domestic product. In deciding whether subject imports would be likely to compete with each other and the domestic product in the event of revocation, the ITC traditionally considers four subfactors: (1) the degree of fungibility between the imports from different countries and the domestic like product, (2) the existence of common or similar channels of distribution for imports and the domestic like product, (3) the presence of sales or offers to sell in the same geographical markets, and (4) whether the imports are simultaneously present in the market. See, e.g., Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989) (citation omitted). The plaintiffs here challenge the ITC's determination with regard to all four subfactors, which the court will discuss in turn.

### 1. Fungibility

With regard to the degree of fungibility between the subject imports and the domestic like product, the plaintiffs make two arguments.  First, they note that the subject producers specialize in either seamless or welded OCTG.  Pls.' Mot. 38.[4]  The plaintiffs argue that the record reveals only limited fungibility between seamless and welded products, and that the price data on the record reveals that seamless products command a premium over welded products.  Id. at 38-39.  Plaintiffs argue that wherever cheaper welded pipe could be used in an application, the consumer would only purchase welded pipe, and that, accordingly, even though seamless pipe might technically be substitutable, the consumer would not perceive it as such.  See id. at 39.  Second, the plaintiffs argue that Japan specializes in the production of niche products that are not available from other producers.  Id.

The ITC's determination addresses both arguments.  First, the ITC notes that the original investigation found that welded and seamless products compete in certain applications.  Commission's Views, C.R. List 2, Doc. No. 91 at 19.  The determination does not, however, address the question of whether price differentials

---

[4]Plaintiffs allege that OCTG producers focus on either welded or seamless product.  Pls.' Mot. 38.  They further allege that they, as well as the Mexican producer TAMSA, produce only seamless product.  See id.  The Korean producers, on the other hand, make only welded OCTG, as well as the remaining Argentine and Mexican producers.  See id.
    Domestic production of OCTG is evenly divided between welded and seamless production.  See Staff Report, C.R. List 2, Doc. No 87 at Table I-3.

between seamless and welded pipe suggest that purchasers would not substitute welded pipe for seamless. In its opposition to plaintiff's motion, the ITC contends that the plaintiffs' argument on this point is misplaced, because the majority of purchasers indicated that foreign and domestic OCTG are "always" interchangeable, thus making clear that the price differential does not impact perceptions of fungibility. Def.'s Opp'n 16; Commission's Views, C.R. List 2, Doc. No. 91 at 20, 20 n.66. Moreover, the ITC argues that the record evidence cited by plaintiff either does not provide meaningful comparisons regarding price differentials or demonstrates that such differentials are not particularly great. Def.'s Opp'n 15, 15 n.6 (citing Staff Report, C.R. List 2, Doc. No. 87 at Tables V-1 and V-2).

Second, the ITC, in its determination, addressed the contention that Japanese OCTG was not fungible with other OCTG because Japan produced high-quality "niche" products. The ITC noted that in its original determination, it found that, while Japan did produce certain unique product lines that had no competition from either domestic or other foreign companies, the majority of Japan's exports were of products that did have foreign and domestic analogues. Commission's Views, C.R. List 2, Doc. No. 91 at 19 n.60 (citing Original Determ., P.R. List 1, Doc. No. 116 at I-23). The ITC also found that the majority of purchaser responses in both the original determination and the reviews

indicated that Japanese OCTG remained relatively fungible with the domestic like product and with other subject imports. See Commission's Views, C.R. List 2, Doc No. 91 at 19 n.61, 21, 21 n.71.[5]

Regarding plaintiffs' argument on the fungibility of welded and seamless OCTG, the record regarding actual price differentials is sparse. The ITC asked purchasers and importers of OCTG whether subject and domestic OCTG were interchangeable: the majority of responses indicate that they were, but did not indicate whether the respondents were basing their answers on technical substitutability or commercial substitutability. See Staff Report, C.R. List 2, Doc. No. 87 at Pages II-27 through II-29. However, domestic industry provided to the ITC a table that shows average prices for welded and seamless casing and tubing over a period of a year. Staff Report, C.R. List 2, Doc. No 87 at Table V-16. During that time, seamless tubing in general commanded a premium over welded tubing ranging from $29 per short ton to $115 per short ton. Id. Seamless casing commanded a premium over welded casing ranging from $32 per short ton to $57 per short ton. Id. Consistent with plaintiffs' arguments here, the ITC's staff itself noted that the

---

[5]The determination also states that "industry witness testimony" supported its fungibility determination with respect to Japan. Commission's Views, C.R. List 2, Doc. No. 91 at 21. It appears, however, that the Staff Report's discussion of this is taken entirely from producer and importer questionnaire responses. See Staff Report, C.R. List 2, Doc. No. 87 at II-29.

consistent difference in pricing must reflect some differences in end uses between seamless and welded OCTG. Id. at Page II-10 n.32. Nonetheless, the ITC staff indicated that the moderate nature of the premium could indicate that a large part of the U.S. OCTG market still experienced competition between welded and seamless OCTG, as was found in the original investigation. Id.; see also Original Determ., P.R. List 1, Doc. No. 116 at I-23.

Thus, while it appears clear that seamless goods command a premium over welded goods, it is not certain, on this record, what this price difference means in actual practice. As the ITC staff indicated, the "moderate nature" of the difference could indicate that competition was present, or it could not. The information that would enable the court to discern whether the price difference actually makes welded and seamless product nonfungible is simply not contained in the record. Normally, such a lack of evidence on an important issue would result in a remand. However, in this case, the court believes that the arguments on this issue are moot with regard to at least one of the plaintiffs. With regard to the remaining two, the court believes this issue has either been waived, or to the extent it was not waived, results in a de minimis harm, and is consequently moot.

With regard to Plaintiff Siderca, the court notes that cumulation is not a producer-by-producer analysis. Rather, the statute calls for the ITC to determine whether the production of

entire countries should be grouped together.  See 19 U.S.C. § 1675a(a)(7).  Of the countries involved in these reviews, only Korea specializes in the manufacture of welded products.  See Revision to the Staff Report, Attach. to Mem. from Lynn Featherstone, Director, Office of Investigations, to the Commission; Re: Investigations Nos. 701-TA-364 (Review) and 731-TA-711 and 713-716 (Review): Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico – Revisions to Staff Report (June 6, 2001), C.R. List 2, Doc. No. 76 at Table C-9 ("Staff Revision"); Staff Report, CR List 2, Doc. No. 87 at Tables C-10 through C-13. Mexico and Argentina have mixed production of welded and seamless goods.  See Staff Revision at Table C-9, Staff Report at Table C-13.  Japan and Italy engage only in seamless manufacture.  See Staff Report, CR List 2, Doc. No. 87 at Tables C-10 & C-11.  U.S. production is nearly evenly split between the manufacture of welded and seamless products.  See Staff Report, C.R. List 2, Doc. No. 87 at  Table I-3.

It follows that any argument that plaintiff Siderca might have regarding cumulation of its imports here appears to have no effect. The nation of Argentina, which is the proper subject of the cumulation analysis, engages in both seamless and welded manufacture and accordingly can compete as regards both types of products.  With regard to plaintiff Siderca, therefore, the issue is moot.  Unlike Siderca, however, plaintiffs Dalmine and NKK Tubes

are based in countries that engage solely in seamless manufacture. Nevertheless, their arguments against cumulation must also be rejected.

With regard to plaintiffs Dalmine and NKK Tubes, the court first notes that Dalmine and NKK Tubes will inevitably find their countries' production cumulated with at least some welded production. The fungibility analysis looks at whether goods, considered on a nation-by-nation basis, are interchangeable enough to support an inference of a "reasonable overlap of competition." Wieland Werke, 13 CIT 561 at 563, 718 F. Supp. at 52. Even if plaintiffs are completely correct in viewing seamless and welded product as nonfungible, to the extent that countries involved in these reviews (i.e., Mexico and Argentina) produce both seamless and welded OCTG in considerable quantities, their production would have a "reasonable overlap of competition" with that of seamless-producing nations like Japan and Italy. Accordingly, regardless of whether price comparisons between the Korean welded product and seamless production indicate that the Korean product is less competitive, plaintiffs' nations' seamless production would be cumulated with that of nations producing welded OCTG. In addition, two other considerations undermine the plaintiffs' claim.

First, the "likely overlap of competition" analysis undertaken here is very much like the analysis the ITC undertakes in determining what the "domestic like product" for a particular

investigation will be.  Compare Wieland Werke, 13 CIT at 563, 718

F. Supp. at 52 with Timken Co. v. United States, 20 CIT 76, 80, 913

F. Supp. 580, 584 (1996).  Particularly, both determinations

require a fungibility analysis.  In the original investigations,

the ITC determined that drill pipe should be considered a separate

product from other OCTG, but did not find that welded and seamless

OCTG should be considered separate like products.  See Staff

Report, C.R. Doc. No. 87 at Page I-25. In responding to the notice

of initiation in these reviews, the plaintiffs took no position

with respect to this like product determination, while reserving

their right to comment at a later time. See id. at n.16.  However,

they do not object to it anywhere in their briefs, or call

attention to any objections lodged during the investigation.

It is true that evidence of fungibility sufficient to underpin

a like product analysis may not be sufficient to underpin other

analyses, such as the likely competition or injury analyses.  See

BIC Corp. v. United States,  21 CIT 448, 455-56, 964 F. Supp. 391,

399-400 (1997); Acciai Speciali Terni, S.p.A. v. United States, 19

CIT 1051, 1063-64 (1995).  However, in this case, it appears to the

court that the plaintiffs complain of a harm that should have been

addressed at the like product stage.  While plaintiffs complain

that seamless and welded goods would not compete because of price

differentials, because the like product analysis has traditionally

been concerned with price, Timken, 20 CIT at 80, 913 F. Supp. at

584, plaintiffs' fungibility argument is not necessarily dependent on the unique context of the likely competition analysis. Moreover, if the plaintiff is correct that seamless and welded goods are simply not commercially fungible, discussion of this issue at the like product stage would have made sense and permitted appropriate investigation and judicial review of the issue. Because plaintiffs failed to raise their argument regarding fungibility when it was most appropriate to do so, the argument is in some sense, waived.

Second, even if the plaintiffs' contentions regarding the fungibility of seamless and welded OCTG are taken as true, the injury they complain of is so small as to be de minimis, and therefore moot. The rule of de minimis is a general rule of legal construction and forms part of the background against which all statutes are construed. Wis. Dep't of Revenue v. William Wrigley, Jr. Co., 505 U.S. 214, 231 (1992). However, the rule is applied only where it is consonant with the intent of the framers of the law. Id.; Alcan Aluminum Corp. v. United States, 165 F.3d 898, 903 (Fed. Cir. 1999); Ciba-Geigy Corp. v. United States, 25 CIT 1252, 1269, 178 F. Supp. 2d 1336, 1352 (2001); Former Employees of Barry Callebaut v. Herman, 25 CIT 1226, 1233-34, 177 F. Supp. 2d 1304, 1311 (2001), rev'd on other grounds at Former Employees of Barry Callebaut v. Chao, 357 F.3d 1377 (Fed. Cir. 2004). The text of the statute clearly allows cumulation where imports are "likely to

compete" with one another.  19 U.S.C. § 1675a(a)(7).  Accordingly,

the question the court must answer is whether the application of

the de minimis rule in this context is consonant with determining

whether imports are "likely to compete."    Given that all

countries in the review but Korea produce seamless product,

plaintiffs NKK Tubes and Dalmine can only reasonably complain that

their countries' production was improperly cumulated with Korea's

welded production.  In 2000, Korea had an OCTG production capacity

of less than 3% of NKK Tubes',[6] Mexico's, Argentina's, and Italy's

combined capacity. Compare Staff Report, C.R. List 2, Doc. No. 87

at Table IV-9[7] with  Foreign Producers'/Exporters' Questionnaires,

CR List 2, Docs. Nos.  105, 109, 113 & 114 at Questions II-6 and

II-16.   Accordingly, even if, as plaintiffs allege, welded and

seamless OCTG are commercially nonfungible, Korea's production is

so comparatively small as to be de minimis.  Again, because Mexico

and Argentina produce both kinds of OCTG, Dalmine and NKK Tubes

will inevitably find their countries' production cumulated with at

least some welded production.  See Foreign Producers'/Exporters'

---

[6]NKK Tubes was the only Japanese producer to respond to the
ITC's inquiries. Staff Report, C.R. List 2, Doc. No. 87 at Page
II-13. U.S. producers estimated that the non-responding Japanese
producers had a potential to supply another 3.5 million short
tons of seamless OCTG.  Id.

[7]It should be noted, however, that the ITC relied, during
its likely volume discussion, on Korea's unused capacity to make
all pipe and tube products, which in 2000 was significant.  See
Commission's Views, C.R. List 2, Doc. No. 91 at 32.

Questionnaires, CR List 2, Docs. Nos. 104 & 107 at Questions II-6 and II-16.

Given the plaintiffs' posture, the answer to the question posed to the court must be that the application of the de minimis rule here does no violence to the cumulation statute. The harm suffered by the plaintiffs due to their countries' cumulation with other countries stems from the increase in volume, price effects, and impact that results therefrom. In this case, however, Korea's production capacity is simply overwhelmed by that of the other producers, to whom plaintiffs' fungibility argument does not apply. Were plaintiffs Korean producers, the harm they would have to allege here as a result of the ITC's fungibility finding would no longer be de minimis, but as it stands plaintiffs cannot assert that such a magnitude of harm would redound to them.

Finally, with regard to plaintiffs' argument that Japan furnishes only niche products and therefore does not compete with either other foreign or with domestic OCTG, the ITC's record clearly shows that such niche products did not account for more than twenty percent of Japanese exports during the original period of investigation. See Commission's Views, C.R. List 2, Doc. No. 91 at 19, 19 n. 60. Thus, while some portion of the Japanese export product is unlikely to compete with subject or domestic merchandise, a significant portion of Japanese production would compete in the U.S. market with similar goods of either foreign or

domestic manufacture. Moreover, producer, purchaser, and importer responses generally reported that Japanese OCTG was fungible with the other OCTG covered in this review and with domestic product. Id. at 20. As only a "reasonable overlap" of competition is statutorily required, see, e.g., Wieland Werke, 13 CIT at 563, 718 F. Supp. at 52, the court agrees with the ITC that while there may be some Japanese specialty products that have no analogues in the market, the majority of Japanese production would compete, and would be fungible with the other products in this review.

### 2. Channels of distribution

Plaintiffs also take issue with the ITC's determination regarding whether or not subject imports are likely to compete in the same channels of distribution with one another and with domestic product. Pls.' Mot. 37. As in the original determination, the ITC found that virtually all OCTG in the U.S. is sold to distributors, who then sell to end users. See Commission's Views, C.R. List 2, Doc. No. 91 at 21. Plaintiffs argue, however, that as members of the Tenaris Group,[8] they focus on direct sales to end users, and their products would therefore not move in the

---

[8]The Tenaris Group is a global alliance of pipe and tube manufacturers. See Commission's Views, CR List 2, Doc. No. 91 at 32-33. The responding subject producers in this investigation that belong to the group are Siderca (Argentina), Dalmine (Italy), TAMSA (Mexico), and NKK (Japan). Id. at 28. The Tenaris companies operate as a unit, submitting a single bid for contracts to supply OCTG and related services. Id. at 28.

distributor market that accounts for the majority of OCTG purchases in the U.S.  Pls.' Mot. 37.

The ITC dealt with this claim in its determination.  Citing the TAMSA post-hearing brief, the ITC argues that national market dynamics affect the distribution channels employed by the Tenaris Group.  See Commission's Views, C.R. List 2, Doc. No. 91 at 21-22, 22 n.73.  To the extent that Tenaris members have sold product in the U.S. during the period of the antidumping order, they have used distributors in a substantial portion of their U.S. sales.  Id. Moreover, the distributor market remains the primary method by which OCTG is sold in the U.S., and U.S. distributors currently purchase substantial volumes of OCTG from subject country producers.  See id. at 22.

It seems to the court that plaintiffs' argument rests entirely on what they would "prefer" to do.  However, their past and present behavior in the U.S. market shows they have no real aversion to selling to distributors.  Moreover, sales to end-users are not currently a favored method of distribution in the United States. While it is not unlikely, in the event of revocation of the antidumping order, that plaintiffs would begin to cultivate end-users clients, there is no reason to believe that they would not also avail themselves of the existing distributor market.

*3. The same geographical markets*

Plaintiffs' challenge to the ITC's determination regarding

whether subject merchandise and domestic goods will compete in the same geographic markets is directed mainly at whether the correct standard of "likely" was used. See Pls.' Mot. 17. As the court has already decided to treat the likeliness question in such a way as to be governed by substantial evidence review, however, the court will here resolve the issue as one of whether evidence amassed by the ITC regarding geographical markets is sufficient to support a finding of "likely" competition. Plaintiffs argue that the ITC rested entirely on its findings in the original determination to hold that subject and domestic merchandise would likely compete in the same geographic markets in the event of revocation of the antidumping order. Id. Plaintiffs argue that the original reviews, at best, show that it is "possible" that the subject and domestic merchandise would compete in the same markets, and that, in order to show a "likelihood" of such competition, new and affirmative evidence would have to be provided. Id.

Plaintiffs appear to mistake the standard that is used to determine cumulation. Evaluating the four factors of fungibility, channels of distribution, geographic markets, and simultaneous presence, the ITC must determine whether or not it is "likely" that the subject and domestic merchandise will compete inter se. There is no requirement that the ITC find that all four subfactors are independently supported by a "likeliness" determination. See, e.g., Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F.

Supp. 50, 52 (1989) (citation omitted).

At any rate, the ITC's determination clearly relies on more than just information from the original determination.  The ITC found that most large distributors of OCTG are located in Texas and that most distributors sell nationwide.  Commission's Views, C.R. List 2, Doc. No. 91 at 23.  Importers similarly reported selling nationwide.  Id.  Given that the market appears to be "nationwide," it is difficult to see how plaintiffs can argue that subject imports and domestic merchandise would not compete in the same geographic market.  Indeed, plaintiffs do not argue that there is any other geographic market or submarket that is relevant.  See Pls.' Mot. 17.  Accordingly, the evidence compiled here is sufficient to support a determination that foreign and domestic OCTG would compete in the same geographical market.

### 4. Simultaneous competition

Plaintiffs also challenge the fourth subfactor in the ITC's analysis, which deals with whether subject imports and the domestic product would compete simultaneously in the market.  In particular, plaintiffs state that the ITC fails to discuss a time-frame for when shipments to the United States would occur.  See Pls.' Reply Br. 5.  Plaintiffs do not point to record evidence suggesting that OCTG is somehow a seasonal good.  Id.  Nor do they challenge the ITC's statement that "[n]othing in the record of these reviews suggests that if the orders are revoked subject imports and the

domestic like product would not be simultaneously present in the domestic market." Id.; Commission's Views, C.R. List 2, Doc. No. 91 at 23. The ITC rather found that the original determinations showed that each of the subject countries imported product each year of the original investigations. Commission's Views, C.R. List 2, Doc. No. 91 at 23. The proposition to be supported here is that steel products are not seasonal goods such that domestic and foreign producers would sell the goods at mutually exclusive time periods. It appears to the Court that the original determination provides such evidence as would enable a reasonable mind to find that the proposition is supported.

Having arrived at the end of the cumulation analysis, it appears that both the ITC's determinations regarding discernible adverse impact and likely competition are supported by substantial evidence on the record. Accordingly, the court finds that the ITC's overall cumulation determination is supported by substantial evidence.

B. *Likely Recurrence of Material Injury*

Having found that the ITC's cumulation decision is supported by substantial evidence on the record, the Court will discuss the ITC's finding that revocation of the antidumping orders is likely to lead to a continuation or recurrence of material injury to the domestic OCTG industry within a reasonably foreseeable period of

time.  To make an affirmative finding that material injury is likely to recur, the ITC is statutorily required to evaluate three factors and determine that these factors support a finding that revocation would lead to material injury in a "reasonably foreseeable" period of time.  See 19 U.S.C. § 1675a(a)(1).  These three factors are (i) the likely volume of subject imports, (ii) the likely price effects of subject imports, and (iii) the likely impact of subject imports.  Id.  Plaintiffs challenge the ITC's findings on all three factors; the Court discusses each factor in turn.

### i. Likely volume

The first factor concerns the likely volume of subject imports in the event of revocation.  See 19 U.S.C. § 1675a(a)(2)(A)-(D).  In concluding that that imports would likely be significant in the event of revocation of the antidumping order, the ITC relied primarily on data showing the growing U.S. market share of subject imports, the subject producers' available production capacity, and their capacity to shift production away from other products and toward OCTG manufacture.  Commission's Views, C.R. List 2, Doc. No. 91 at 29-32.  The ITC also relied on the Tenaris Group's global sales focus, the high value of OCTG products relative to other pipe and tube products, and the high prices available in the U.S. market, relative to the global OCTG market.  Id. at 32-33.  Finally, the ITC relied on the effects of U.S. and foreign

antidumping orders, and its finding that the reviewed countries are focused on export markets.  Id. at 33-35.

Plaintiffs do not challenge the ITC's findings that the cumulated subject producers have significant available capacity, or that the U.S. market has attractive pricing compared to the global market.  Rather, plaintiffs make three arguments to the effect that, despite the subject producers' production capacity and the economic attractions of the U.S. market, the subject producers will not export in any great quantity.  First, plaintiffs argue that the record evidence demonstrates that the Tenaris Group's focus on long-term contracts would prevent it from re-entering the U.S. market in any significant way. Pls.' Mot. 27.  Second, plaintiffs challenge whether evidence showing that OCTG is a high-value good relative to other products is sufficient to demonstrate an incentive for subject producers to ship a significant volume of goods.  Id. at 28.  Third, plaintiffs challenge the relevance of U.S. antidumping orders on OCTG and related products.  Id. at 30.

First, regarding the alleged "export-focus" of the subject producers, the ITC recognized the Tenaris Group as the dominant OCTG supplier in every world market except the United States.  See Commission's Views, C.R. List 2, Doc. No. 91 at 32.  Many of Tenaris' foreign customers also operate in the United States.  Id. at 33.  The ITC concluded, accordingly, that in the event of revocation of the antidumping order, the Tenaris Group would have

a "strong incentive" to enter the U.S. market, because (a) the U.S. represents the last available unclaimed market for the Group and (b) because the Group already have established business relationships with customers operating in the U.S. market.    Id. at 33.

The plaintiffs allege that the record shows that Tenaris Group members have long-term commitments to supply OCTG to customers outside the United States.  Pls.' Mot. 27.  Plaintiffs claim that because of the high capacity utilization among group members, any significant increase in exports to the U.S. market would require that the Tenaris Group break these commitments.  Id. at 28. Plaintiffs argue that Tenaris Group members would not be willing to go so far merely in order to take advantage of the U.S. market.

The ITC's position appears to be that the U.S. market is attractive enough to justify breaking such commitments.  The U.S. represents the last market in which Tenaris has not achieved dominance; moreover, it is the largest market for OCTG in the world.  See Commission's Views, C.R. List 2, Doc. No. 91 at 32, 33. U.S. prices for OCTG run between twenty and forty percent above Tenaris' worldwide prices.  See id. at 33 n.128.  Given the Group's already established business relationships with U.S. customers, significant entry into the U.S. market could reasonably be seen as enhancing the Group's long-term contracts.  Id. at 33, 33 n.124. Finally, the plaintiffs' argument does not detract from the ITC's

finding that non-Tenaris Group producers, such as the majority of Japanese producers, have substantial capacity available for export to the U.S. See id. at 31-32.

The court holds, therefore, that the ITC has provided sufficient explanation for the conclusion that the Tenaris Group's long-term commitments and/or end-user focus do not stand in the way of significant imports. Even if high capacity utilization prohibits the Tenaris Group members from making more OCTG to fulfill U.S. market demands, the size of the market, the prices available, and the established presence of Tenaris customers, all provide a significant economic incentive. The ITC did not ignore the argument that end-user focus and high capacity utilization would serve to limit Tenaris group exports. Rather, it explained exactly why it found the claim regarding such a limit not to be compelling.

Second, plaintiffs challenge whether evidence showing that OCTG is a high-value good relative to other products is sufficient to demonstrate an incentive for subject producers to ship a significant volume of goods. Pls.' Mot. 28. Plaintiffs claim that the ITC does not discuss how the high-value of OCTG explains away the subject producers' high capacity utilization, long-term contracts, and other long-standing commitments to customers. Id. at 28-29. Moreover, plaintiffs argue that because the Tenaris Group provides full-service supply arrangements for end-users, the

price of an individual product is of lesser importance.  Id. at 29.

The ITC's determination states that OCTG generates very high profit margins relative to other pipe and tube products.  See Commission's Views, C.R. List 2, Doc. No. 91 at 33.  Moreover, the ITC states that, because various pipe and tube products are all produced on the same machinery, subject producers can shift production away from other pipe and tube products and toward OCTG with relative ease.  Id. at 30, 30 n.112.  It appears that this brief ITC argument on the value of OCTG and product-shifting is meant to respond to the issue of the subject producers' high capacity utilization by identifying a way in which exports could be increased.  Id. at 33.

The court has already held that the ITC's discussion of the relatively high prices in the U.S. market, the size of the market, and the presence of Tenaris customers in the market provide a significant rebuttal to the question of capacity restraints and long-term contracts.  The ITC's point regarding OCTG's value and product-shifting merely reinforces the finding that some of the subject producers' large production capacity could profitably be redirected toward the U.S. market.

Third, plaintiffs challenge the relevance of U.S. antidumping orders on OCTG and related products to the "likely volume" analysis. Pls.' Mot. 30.  The ITC found that Argentine, Japanese, and Mexican producers are subject to antidumping orders on

standard, line and pressure pipe, a pipe product produced in the same production facilities as OCTG. Commission's Views, C.R. List 2, Doc. No. 91 at 34. The ITC also found that Korean producers were subject to U.S. import quotas and antidumping orders on similar pipe products, as well as a Canadian antidumping order on casing. Id. at 34-35.

The ITC is statutorily required to take into account "the existence of barriers to the importation of such merchandise into countries other than the United States." 19 U.S.C. § 1675a(a)(2)(C). Plaintiff complains that the ITC impermissibly considered U.S. barriers as well as foreign barriers. Pls.' Mot. 30. However, while § 1675a(a) requires the ITC to look at certain factors, such as barriers to the importation of merchandise in other countries, it makes clear that those factors are non-exclusive, and that the ITC must consider "all relevant economic factors." 19 U.S.C. § 1675a(a). Presumably, these may include the existence of barriers to the importation into the U.S. of pipe products so similar to OCTG that they are actually made on the same production lines. Because barriers to the importation of products similar to subject merchandise may encourage product-shifting toward OCTG, and thus, more OCTG in the U.S. market, the existence of U.S. barriers to import of similar products is clearly economically relevant.

Accordingly, the evidence provided by the ITC is sufficient to

support the conclusion that there would likely be a significant volume of imports into the U.S. upon revocation of the orders, owing to non-Tenaris Group subject producers' available capacity, and the economic incentives that Tenaris Group members have to enter the last market in which they do not have dominance, in which prices are high, and where they already have established customers.

### ii. Likely price effects

Having discussed the ITC's treatment of the likely volume factor in its material injury determination, the Court will consider the second factor: likely price effects of subject imports in the event of revocation. See 19 U.S.C. § 1675a(a)(1). The ITC is statutorily required to consider two subfactors in evaluating the likely price effects. These are (1) whether there is likely to be significant underselling by the subject imports as compared with the domestic like product and (2) whether the subject imports are likely to enter the United States at prices that would have a significant depressing or suppressing effect on the price of domestic like products. See 19 U.S.C. § 1675a(a)(3). In its determination, the ITC noted that both factors were found satisfied in the original investigations. See Commission's Views, C.R. List 2, Doc. No. 91 at 35-36.

In the sunset review, the ITC found that, to the extent that direct selling comparisons can be made, subject OCTG generally undersold the domestic like product during the period under review.

Id. at 36.   The ITC also found that subject imports are highly substitutable for domestic product and that price is a very important factor in OCTG purchasing decisions.  Id.  Accordingly, the ITC found that, in the event of revocation of the antidumping order, the subject producers would likely seek to compete in the U.S. market based on price.  Id. at 37.  Furthermore, the ITC found that such competition would likely have significant depressing or suppressing effects on the prices of the domestic like product. Id.

Plaintiffs challenge the ITC's determination by arguing that the record evidence shows that domestic prices had risen in 2000. Pls.' Mot. 31.[9]  Indeed, the record demonstrates that, generally speaking, domestic prices fell in 1999 and rose in 2000, although they did not recover to 1998 levels.  See Commission's Views, C.R. List 2, Doc. No. 91 at 36, 36 n.141.  Plaintiffs' argument, however, does not appear to be on point.  Even if prices did increase somewhat during 2000, this does not undermine the ITC's conclusion that the subject producers would seek to compete on the basis of price, and that their underselling would have price suppressing or depressing effects.  Rather, the plaintiffs merely observe that the price to be undermined is somewhat higher than it was previously.

_____

[9]Plaintiff also argues that the record demonstrates that prices would continue to rise despite the revocation of the orders, but provides no citations.  Pls.' Mot. 31.

Plaintiffs further argue that plaintiff Siderca's assigned dumping margin of 1.36% demonstrates that in the event of revocation, underselling by plaintiffs would not be particularly great. Pls.' Reply Br. 8. However, it remains that this does not address the price effects of plaintiffs NKK Tubes and Dalmine, both of which have significantly higher margins. See Commission's Views, C.R. List 2, Doc. No. 91 at 16 n.51. Nor does it take into account that plaintiff Siderca's imports have been cumulated with those of Italy, Korea, Japan, and Mexico. Accordingly, plaintiffs have not pointed to any important factor that the ITC ignored in making its price effects determination.

The ITC's determination demonstrates that the behavior of the producers reviewed here caused price effects in the past, that their goods are substitutable for domestic goods, and that they are likely to compete on the basis of price. The ITC has thus provided "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (citations omitted).

*ii.  Likely impact*

The third factor that the ITC is required to investigate concerns the likely impact of subject imports in the event of revocation. See 19 U.S.C. § 1675a(a)(2)(A)-(D). The original determinations demonstrated that the subject producers' imports led to a decline in domestic producers' market share, poor operating

performance, and low capacity utilization.  See Commission's Views,
C.R. List 2, Doc. No. 91 at 37.   The original investigation also
determined that subject producers' imports had led to price
suppression.  See id. at 38.

        However,  the  determination  at  issue  here  found  that  the
domestic industry had markedly recovered. As the ITC stated, "we do
not find the industry to be currently vulnerable."   Id. at 39.
Nonetheless, the ITC found that while currently healthy, the sheer
volume of subject imports that would be likely in the event of
price revocation, along with their cumulated price effects, would
be enough to likely cause a recurrence of material injury even to
this now recovered industry.  Id. at 39-40.

        Plaintiffs take issue with this finding, given the current
state of the U.S. industry.  Pls.' Mot. 32-34.  Plaintiffs point to
strong performance indicators for domestic producers, as well as
statements by officials of domestic companies forecasting continued
strong demand for OCTG.  Id. at 34-35.

        As the ITC itself admitted, the domestic OCTG industry is
currently healthy.  Commission's Views, C.R. List 2, Doc. No. 91 at
38-39.   There appears to be  some indication that demand will
remain strong.  Id. at 39.  Yet the original determinations found
that even in a time of increasing demand, the domestic producers
quickly lost market share to the subject producers.  Id. at 39.
Moreover,  the  sheer  volume  of  subject  producers'  production

capacity, coupled with their apparently low prices, support the conclusion that even a healthy industry could be materially injured were the order here revoked.

The court notes that in applying the substantial evidence standard, it is not allowed to re-decide the question before the agency. Rather, it must only decide whether the agency has provided evidence that would be adequate to "a reasonable mind." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (citations omitted). Reasonable minds may differ, but a determination does not fail for lack of substantial evidence on that account.

Accordingly, the court holds that the ITC has provided substantial evidence to ground its finding that the probable or "likely" impact of subject imports would be significant, enough so as to support a finding that material injury would likely recur.


CONCLUSION


The Court affirms the ITC's use of the term "likely" as applied throughout its remand determination. The Court affirms the agency's findings on cumulation of the subject imports. The court also affirms the ITC's determination regarding the likely volume, price effects, and impact of subject imports in the event of revocation of the antidumping orders on SLP from Argentina, Italy,

Japan, Korea, and Mexico.  Judgment will be entered accordingly.


                                        _____/s/_____
                                        Donald C. Pogue
                                           Judge

Dated:    August 26, 2005
          New York, New York